STATE OF CONNECTICUT *v.* ROY WHITE
(13941)

STATE OF CONNECTICUT *v.* WINSTON WATKINS
(13945)

PETERS, C. J., BERDON, NORCOTT, KATZ and PALMER, Js.

Argued November 30, 1993—decision released March 16, 1994*

*Kent Drager,* assistant public defender, for the appellant in each case (defendant).

* March 16, 1994, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

*Richard F. Jacobson,* assistant state's attorney, with whom, on the brief, were *Donald A. Browne,* state's attorney, and *Gary Nicholson,* assistant state's attorney, for the appellee in each case (state).

KATZ, J. The dispositive issue in each of these appeals is whether the state's suppression of exculpatory evidence so impaired the fairness of the proceedings against the defendants that the trial court was required to grant their motions for a new trial or to dismiss the charges against them. After a joint trial before a jury, the defendants, Roy White and Winston Watkins, were convicted of capital felony pursuant to General Statutes § 53a-54b (8),[1] attempted murder pursuant to General Statutes §§ 53a-54a and 53a-49,[2] assault in the first degree pursuant to General Statutes § 53a-59 (a) (1)[3] and carrying a pistol without a permit pursuant to General Statutes §§ 29-35 and 29-37 (b).[4] Although it ini-

[1] General Statutes § 53a-54b provides in relevant part: "A person is guilty of a capital felony who is convicted of . . . (8) murder of two or more persons at the same time or in the course of a single transaction."

[2] General Statutes § 53a-54a provides in relevant part: "(a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person."

General Statutes § 53a-49 (a) provides: "A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he: (1) Intentionally engages in conduct which would constitute the crime if attendant circumstances were as he believes them to be; or (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime."

[3] General Statutes § 53a-59 (a) (1) provides: "A person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument."

[4] General Statutes § 29-35 provides in relevant part: "(a) No person shall carry any pistol or revolver upon his person, except when such person is within his dwelling house or place of business, without a permit to carry the same issued as provided in section 29-28."

General Statutes § 29-37 provides in relevant part: "(b) Any person violating any provision of subsection (a) of section 29-35 may be fined not more

tially sought the death penalty for both defendants, the state did not offer any evidence of an aggravating factor at the penalty stage of the trial. The trial court therefore sentenced both defendants to life in prison without possibility of release on the capital felony counts.[5] The defendants have appealed directly to this court pursuant to General Statutes § 51-199 (b) (3). We reverse the judgments of the trial court.

The jury could reasonably have found the following facts. At 1:58 p.m. on November 10, 1987, Bridgeport police officers were dispatched to investigate a shooting in the area of the Jamaican Club. When they arrived, they discovered the bodies of Lilla McCalla and Llwellyn Blake in Blake's Market. Each had been fatally shot in the back of the head with a nine millimeter gun. While at the market, the police were informed that a third shooting victim was being treated at Bridgeport Hospital. The third victim, Vernon Crummie, had been shot twice with a .45 caliber gun.

Nine days later, on November 19, 1987, the Bridgeport police met with Crummie in his hospital room. Detective Leo Krusinski brought a photographic array to the hospital for Crummie to view. The six picture array included a photograph of Watkins. Crummie identified Watkins as one of the two men involved in the shootings, but indicated he was not the man who had shot him. Crummie then gave a statement to the police. Thereafter, Crummie again picked out Watkins' photograph from

than one thousand dollars and shall be imprisoned not less than one year nor more than five years, and, in the absence of any mitigating circumstances as determined by the court, one year of the sentence imposed may not be suspended or reduced by the court."

[5] Each defendant was also sentenced to terms of twenty years for attempted murder, twenty years for assault in the first degree, and five years for carrying a pistol without a permit. These terms were to run consecutively to each other, but concurrently with the term of life in prison. This resulted in a total effective sentence of life in prison without the possibility of release for each defendant.

the array. At trial, Crummie testified that he had seen Watkins at Blake's Market and the Java Restaurant on several occasions prior to the shootings.

On May 10, 1988, Krusinski asked Crummie to come to the Bridgeport police station to view another photographic array. Crummie did so and, from a six picture array, selected a photograph of White as the man who had shot him in Blake's Market. On the same day, Crummie was also shown a thirteen picture array that included a different photograph of White. Crummie again selected the photograph of White as the man who had shot him.

Although Crummie identified White in both arrays, he said he had a slight doubt and would like to see White in person in order to be positive about his identification. On May 16, 1988, Crummie went to the Bridgeport police station to view a lineup. After viewing the lineup, Crummie positively identified White as the man who had shot him in Blake's Market. Crummie also looked at the two photographic arrays he had first viewed on May 10 and signed the backs of the two photographs of White that he had previously selected.

Crummie was the prosecution's key witness at trial. He testified that he had known McCalla and Blake for many years and that they had been dating for approximately six years. Blake had been operating Blake's Market, a grocery store, for nine or ten months at the time of the shootings. Crummie often stopped at the store and helped Blake and McCalla in his spare time.

Crummie testified that on the day of the shootings, he had stopped by Blake's Market on his way to work at about 1:40 p.m. He had been there only a short time when the two defendants entered the store with guns drawn. Watkins entered first, ran past Crummie and jumped over a counter to the side on which Blake and McCalla stood. White entered behind Watkins, stopped a yard from Crummie and faced him. Crummie said

"What's up?" to White, and White shot him in the neck. As Crummie ran toward the front door to escape he was shot a second time in the back. As Crummie ran out of the store and across the street, he heard explosions coming from inside the store. He did not·see the defendants emerge from the store. Crummie flagged down an approaching car and the driver drove him to the hospital. Crummie also testified at trial to his photographic identifications of both defendants and his lineup identification of White.

Zaida Brown was the only other witness at trial who could place a defendant near the crime scene. She testified that she had seen Watkins near her home around the time of the shootings. A city engineer testified that Brown had lived approximately 720 feet from Blake's Market. Brown testified that she had seen Watkins running through a neighbor's backyard. She said Watkins had come from the general direction of Blake's Market.

On appeal, both defendants claim that the trial court improperly: (1) refused to dismiss the charges against them or order a new trial even though the state had improperly suppressed exculpatory evidence, depriving the defendants of a fair trial; (2) refused to dismiss the charges against them even though there was insufficient evidence to support the two witness requirement of General Statutes § 54-83; (3) allowed them to be tried before a death qualified jury; (4) allowed them to be shackled while appearing in court before the jury; (5) refused to grant a mistrial after it was discovered that a police officer who had testified for the state had discussed his testimony with a juror during a recess; (6) admitted evidence showing consciousness of guilt; (7) refused to hold that Crummie's testimony was incredible as a matter of law, thereby making the evidence insufficient to convict them; and (8) refused to declare a mistrial or order a new trial based on various factors that impaired the fairness of the trial. Each

defendant also contends, separately, that the trial court improperly refused to suppress the photographic identifications made by Crummie. In addition, White claims that the trial court improperly: (1) refused to suppress Crummie's lineup identification of him; and (2) refused to sever his trial from that of Watkins.

I

Both White and Watkins claim that the state withheld exculpatory evidence in violation of *Brady* v. *Maryland,* 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), and thereby deprived them of a fair trial. Because we find merit in this claim, we reverse the convictions of both defendants and remand their cases for a new probable cause hearing and, if appropriate, a new trial.

The following additional facts are relevant. At the June 16, 1988 probable cause hearing for the two defendants, the state represented that there was no exculpatory evidence to disclose to the defendants. Crummie was the sole witness at the probable cause hearing. On June 27, 1988, and July 25, 1988, White and Watkins, respectively, filed pretrial motions seeking disclosure of any exculpatory evidence. The state did not disclose any materials pursuant to these motions.

On November 7, 1989, after several weeks of jury selection, Sandra Harris, a prospective juror, indicated during voir dire that she was reluctant to sit as a juror on the case. The court spoke to her in chambers and then excused her. The court informed counsel that Harris had disclosed that she had been in Blake's Market with the people she presumed were responsible for the shootings. Counsel were then allowed to interview Harris. At trial, Harris testified that she had been in Blake's Market on November 10, 1987, around 12:15

p.m., when two black males had entered the store with guns. She stated that the two males, who were not the defendants, had allowed her to leave.

Apparently, both the state and the defendants had been unaware of Harris prior to November 7, 1989. Defense counsel argued before the trial court, however, that in light of Harris' disclosures, the state must have some evidence in its file concerning two people who had entered the store with guns within one hour of the time Crummie claimed the shootings had occurred. The court expressed disbelief that such information could exist, in light of the state's obligation to have disclosed all exculpatory evidence previously to the defense. The state offered to allow the court to review some information in camera, but asserted that such information would not be exculpatory in any case. The trial court was skeptical of this view, but denied defense counsels' request to have it review the state's entire file. Instead, the court reviewed three statements submitted by the state and ordered that they be released to the defense because they contained potentially exculpatory material.

One of the statements resulted from a police interview of Desmond Whyte. During the interview, Whyte stated that he had had a telephone conversation with the victim Llwellyn Blake at 1:15 p.m. on the day of the shootings. Whyte further stated that Blake had told him that earlier that day, a person called Pepper had entered the store with a gun, looked around, and then left. Later, two more males had entered the store with guns and were going to kill another person in the store until Blake had talked them out of it. According to Whyte, Blake had told him that these two males had left the store saying that they would kill anyone they found.[6]

---

[6] The two other statements resulted from police interviews with Richard Freckleton. In one of these statements, Freckleton had stated that he was

The trial court ordered the state to review its file and turn over to the defense any exculpatory evidence found therein. On November 11, 1989, the state decided to turn over all witness statements to the defense. Two of these statements had been given to the police by Anthony Blake, the brother of victim Llwellyn Blake. Anthony had told the police that he had been shot in the leg by someone named Dave, who was also known as Mark Morris, with a .45 caliber gun four months before the shootings. Anthony had stated that Dave had shot him because he would not let Dave sell drugs in front of Blake's Market. In addition, Anthony had told the police that the day before the shootings, his brother had received a death threat from Dave. Anthony had told the police that he thought his brother had been killed because of the argument over whether Dave and his people could sell drugs in front of the store. Anthony had stated that his brother had also received a call earlier in the week warning that Dave and another person called Donovan were going to come to Connecticut, rob the Blake brothers, shoot Anthony and take over Blake's Market in order to sell drugs.

The state also turned over to the defense statements from Crummie, Edgar Meyers and Trevor Ricketts. Crummie's statement, which had been taken by the police at the hospital on November 19, 1987, indicated that he had previously never seen the man who had shot him and that he did not think that he would be able to recognize him if he saw him again. The statements of Ricketts and Meyers suggested that the shootings had occurred prior to 1:30 p.m., rather than sometime between 1:45 and 2 p.m., as Crummie's testimony suggested. At a later date, the state turned over to the defense police incident reports concerning the shoot-

also known as Pepper, and that he had entered Blake's Market sometime prior to noon on November 10, 1987, armed with a nine millimeter gun that belonged to his friend Ron.

ing of Anthony Blake by Dave. Reports from July 2 and July 3, 1987, related Anthony Blake's complaint that on July 2, Dave had shot him in the leg in front of Blake's Market with a nine millimeter handgun. One week earlier, Dave had pointed the gun at Anthony in Blake's Market. Anthony had told the police in the reports that he had loaned Dave $1000, and that Dave had pulled out a gun every time Anthony had tried to collect.

On November 13, 1989, the defendants filed a motion to dismiss some of the charges against them, claiming that the state's withholding of exculpatory evidence had undermined the validity of their probable cause hearing and prejudiced their ability to prepare a defense. This motion was denied on December 1, 1989, and the defendants took exceptions. The trial court refused to make an explicit ruling on whether or not the statements were exculpatory. The defendants then filed a motion for articulation, which was also denied. The trial court stated that it did not have to rule explicitly on whether the statements were exculpatory because there was insufficient prejudice to the defendants to merit dismissal in any case. The trial court also denied the defendants' supplemental motion to dismiss and their motions for a new trial.

This court has long held, "on the basis of *Brady* v. *Maryland,* [supra, 373 U.S. 83], and its progeny, that '[s]ince the adversarial probable cause hearing [mandated by article first, § 8, of the Connecticut constitution as amended] . . . is an essential part of a defendant's criminal prosecution, the constitutional obligation to disclose exculpatory material attaches at that time.' . . . [I]n *State* v. *Shannon,* 212 Conn. 387, 406, 563 A.2d 646 [cert. denied, 493 U.S. 980, 110 S. Ct. 510, 107 L. Ed. 2d 512] (1989), we held that in order for this court to consider claims of nondisclosure of exculpatory material at a probable cause hearing

required by our state constitution, the defendant must demonstrate: '(1) that the prosecution suppressed evidence; (2) that the evidence was favorable to the defense; and (3) that it was material.' *State* v. *Milner,* 206 Conn. 512, 539, 539 A.2d 80 (1988). We further held, in *Shannon,* that the materiality of such exculpatory evidence is to be determined by utilizing the test set forth in *United States* v. *Bagley,* 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985). *State* v. *Shannon,* supra, 406–407. Under the *Bagley* test, nondisclosed exculpatory evidence will be considered material only if 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.' *United States* v. *Bagley,* supra, 682. . . . It is well established that '[i]mpeachment evidence as well as exculpatory evidence falls within *Brady's* definition of evidence favorable to an accused.' *State* v. *Pollitt,* 205 Conn. 132, 142, 531 A.2d 125 (1987); *United States* v. *Bagley,* supra, 676." *State* v. *McPhail,* 213 Conn. 161, 166–67, 567 A.2d 812 (1989).

The state does not seriously contend that the statements and incident reports described above were not suppressed. All of the statements were taken by the police in November, 1987, seven months before the June 16, 1988 hearing on probable cause. The incident reports were filed even earlier, in July, 1987. "Police are treated as an arm of the prosecution for *Brady* purposes . . . ." (Internal quotation marks omitted.) *Demers* v. *State,* 209 Conn. 143, 153, 547 A.2d 28 (1988). Accordingly, nondisclosure of the reports and statements constitutes suppression by the prosecution even if, at the time of the hearing on probable cause, the reports and statements were in the police files rather than the prosecutor's files. Id., 153–54. There-

fore, the first prong of the three part test announced in *State* v. *Shannon,* supra, 212 Conn. 387, has been met.

The second prong of *State* v. *Shannon,* supra, 212 Conn. 387, requires that the evidence must be favorable to the defense. The state claims that the statements of Ricketts and Meyers, which indicated that the shootings had been committed sometime prior to 1:30 p.m., bolstered Crummie's testimony at the probable cause hearing and therefore were not favorable to the defense. We disagree. Crummie testified at the hearing that he had arrived at Blake's Market sometime between 1:30 and 2 p.m. The statements of Ricketts and Meyers indicated that the shootings had already taken place by 1:30 p.m. While the Meyers and Ricketts statements do not significantly impeach Crummie, any impeachment is "favorable" to the defense. The state concedes that Crummie's statement that he would not recognize the man who had shot him if he saw him again was favorable to the defense. The statements by Whyte, Blake and Richard Freckleton, and the police incident reports, all suggest that other people either were in Blake's Market with guns on the day of the shootings or had a motive to harm the victim Blake. This evidence was clearly favorable to the defense, in satisfaction of the second prong of *State* v. *Shannon,* supra, 212 Conn. 387.

We also conclude that the third prong of *State* v. *Shannon,* supra, 212 Conn. 387, requiring materiality has been satisfied. As stated above, Crummie was the only witness who testified at the probable cause hearing. Because there was no physical evidence linking the defendants to the shootings, Crummie's testimony was the only evidence connecting them to the crimes and, therefore, was critical. This court has stated many times that when the prosecution's case hinges entirely on the testimony of certain witnesses, information

affecting their credibility is material. *Demers* v. *State,* supra, 209 Conn. 161–62; *State* v. *Green,* 194 Conn. 258, 266, 480 A.2d 526 (1984), cert. denied, 469 U.S. 1191, 105 S. Ct. 964, 83 L. Ed. 2d 969 (1985); *State* v. *Storlazzi,* 191 Conn. 453, 462, 464 A.2d 829 (1983). Further, while the impeachment evidence alone may be insufficient to establish a *Brady* violation, it is clearly sufficient when coupled with the evidence that other gunmen were in the store and that others had a motive for committing the crime. The importance of the evidence that other gunmen were in the store on the day of the shootings is underscored by Crummie's testimony at the hearing that he had not actually witnessed the shootings of McCalla and Blake. These shootings resulted in the most serious charges against the defendants.

Under these circumstances, we conclude that there exists a reasonable probability that the result of the probable cause hearing would have been different had the various statements and incident reports been provided to the defendants. In reaching this conclusion, we are cognizant of "what adverse effect the non-disclosure may have had on the defendant[s'] preparation or presentation of [their] case[s] and that we should act with an awareness of the difficulty of reconstructing in a post-trial proceeding the course that the defense and the [probable cause hearing] . . . would have [otherwise] taken . . . ." (Internal quotation marks omitted.) *State* v. *McPhail,* supra, 213 Conn. 168. In light of the meagerness of the state's presentation and the nature of the evidence withheld from the defense, we conclude that confidence in the outcome of the probable cause hearing has been undermined.

Our conclusion that the state's suppression of exculpatory materials invalidated the defendants' probable cause hearing does not end our analysis. In *State* v. *McPhail,* supra, 213 Conn. 170, we held that even if

there has been a failure to disclose exculpatory evidence at a criminal defendant's probable cause hearing, the defendant is not entitled to a reversal of his conviction unless "the nondisclosure did in fact taint the defendant's subsequent prosecution" and "deprived the defendant of his constitutional right to a fair trial." We conclude that it did.

In this case, the exculpatory materials were disclosed to the defense during jury selection. We have said that, "[w]here there has been an initial disclosure of exculpatory evidence at trial, the appropriate standard to be applied is whether the disclosure came so late as to prevent the defendant from receiving a fair trial." (Internal quotation marks omitted.) *State* v. *Walker,* 214 Conn. 122, 127, 571 A.2d 686 (1990). In other words, exculpatory evidence "must be disclosed at a time in which it can be [effectively] used." *State* v. *Pollitt,* 199 Conn. 399, 414, 508 A.2d 1 (1986). When exculpatory evidence is not timely disclosed its potential importance to the defense must be evaluated in light of the strength or weakness of the evidence presented against the defendant. *State* v. *Amarillo,* 198 Conn. 285, 298, 503 A.2d 146 (1986); *State* v. *Green,* supra, 194 Conn. 264.

The defendants concede that they were able to make effective use of much of the exculpatory evidence at trial. They claim, however, that they were prejudiced by their inability to interview Anthony Blake and Dave in preparing their defenses. The state does not dispute that both of these individuals would have been available to the defense at the time of the probable cause hearing. By the time the exculpatory information was disclosed, however, Dave had disappeared and Anthony Blake had relocated to Jamaica.[7] The defendants claim

---

[7] The state claims that the defendants have not sufficiently demonstrated that these potential witnesses were unavailable at the time of trial. The

that, had they been able to interview these two individuals, they might have been able to present evidence at trial that individuals other than themselves were responsible for the shootings.

As stated above, we must evaluate the defendants' claim in light of the evidence presented against them. The state's case was entirely dependent on Crummie's testimony and credibility. As will be discussed in part II A, there were many troubling inconsistencies in Crummie's trial testimony. In addition, Harris testified at trial that she had seen two other gunmen in Blake's Market on the day of the shootings. If the defendants had been able to bolster this testimony with evidence concerning Dave, his people, and their motive for killing the Blake brothers, there is a reasonable probability that the outcome of the trial would have been different. *State* v. *Monteeth,* 208 Conn. 202, 215, 544 A.2d 1199 (1988). We conclude, therefore, that the failure of the state to disclose the exculpatory evidence at the probable cause hearing deprived the defendants of their constitutional rights to a fair trial. *State* v. *McPhail,* supra, 213 Conn. 171. The convictions must therefore be reversed.[8]

We conclude that the defendants are also entitled to a new probable cause hearing. In *State* v. *Boyd,* 221 Conn. 685, 697, 607 A.2d 376, cert. denied,     U.S.   , 113 S. Ct. 344, 121 L. Ed. 2d 259 (1992), we reiter-

state conceded at trial that Dave had been incarcerated in Connecticut at the time of the probable cause hearing, but that subsequently, the state had had to nolle a prosecution because Dave could not be located. At trial, the defense presented an investigator who testified that she had been unable to locate Anthony Blake, but had learned that he was in Jamaica and was having immigration problems. We conclude that the defendants have sufficiently established the unavailability of these two individuals.

[8] On remand, the defendants will have the opportunity to argue that they continue to be prejudiced by the state's failure to disclose the exculpatory evidence and that dismissal of the charges against them is therefore required.

ated that "the remedy for a defective probable cause hearing is . . . a new probable cause hearing and a new trial." Although the state's *Brady* violation would have been considered harmless error had it not impaired the fairness of the defendants' trial; *State* v. *McPhail,* supra, 213 Conn. 171; our reversal of the convictions requires a new hearing on probable cause to be held.

## II

Because of our disposition of the defendants' *Brady* claim, we need only consider those additional claims asserted by the defendants that could result in acquittal or that are likely to arise again at retrial. Accordingly, we need not reach their claims that the trial court improperly: (1) allowed them to be tried before a death qualified jury;[9] (2) refused to dismiss the charges against them because there was insufficient evidence to support the two witness requirement of General Statutes § 54-83;[10] (3) refused to grant a mistrial after it was discovered that a police officer who had testified for the state discussed his testimony with a juror dur-

[9] The defendants assert that because the state offered no evidence of an aggravating factor during the penalty phase of their trial, the state may not seek the death penalty against them at a new trial. See *Arizona* v. *Rumsey,* 467 U.S. 203, 104 S. Ct. 2305, 81 L. Ed. 2d 164 (1984); *State* v. *Daniels,* 207 Conn. 374, 542 A.2d 306 (1988), cert. denied, 489 U.S. 1069, 109 S. Ct. 1349, 103 L. Ed. 2d 817 (1989). We decline to consider the claims limited to death penalty cases because of the uncontroverted representation by the defendants that they will not arise on remand.

[10] At oral argument, defense counsel urged this court to reach this issue even if a new trial were ordered on other grounds. Counsel claimed that the two witness requirement of General Statutes § 54-83 applies to all capital felony cases, even where the state does not seek the death penalty. Therefore, counsel argued that even though the defendants should not be facing the death penalty at a new trial; see footnote 9; the two witness requirement would arise on remand.

We note that neither party has briefed the issue of whether § 54-83 applies to capital felony prosecutions where the state does not seek the death penalty. We therefore decline to consider it.

ing a recess;[11] (4) admitted evidence showing conscious-ness of guilt;[12] and (5) refused to declare a mistrial or order a new trial based on various factors that impaired the fairness of their trial.[13]

## A

We must examine the defendants' claim that the evi-dence presented at trial was insufficient to support the jury's verdicts because its disposition could result in the defendants' acquittal. Specifically, the defendants claim that the testimony of the only eyewitness to the crime, Crummie, was incredible as a matter of law, and therefore inadequate to support the convictions.[14] We reject this claim.

"The standard of review of an insufficiency claim is twofold. ' "We first review the evidence presented at trial, construing it in the light most favorable to sus-taining the facts expressly found by the trial court or impliedly found by the jury. We then decide whether, upon the facts thus established and the inferences rea-sonably drawn therefrom, the trial court or the jury

[11] We presume that this issue will not arise again on remand.

[12] Defense counsel conceded at oral argument that although the state had attempted to elicit evidence of consciousness of guilt from a witness, the evidence had not been forthcoming, and also that the trial court had never instructed the jury concerning consciousness of guilt. We therefore decline to review this claim.

[13] These factors include, among other things: (1) various alleged changes in Crummie's testimony; (2) the conversation between the state's witness and the juror; (3) the fact that the state was allowed to present the testi-mony of the doctor who treated Crummie before Crummie testified, even though the doctor's testimony was not relevant without Crummie's testi-mony; and (4) the intimidating atmosphere that was created by the pres-ence of highly visible security personnel, a sniffing dog, a metal detector and a state police officer at the door to the courtroom. Because it is unlikely that all of these factors will arise again on remand, we decline to consider this claim of cumulative error.

[14] The defendants do not claim that Crummie's testimony, if believed, was insufficient to support their convictions, only that his testimony was incredible as a matter of law.

could reasonably have concluded that the cumulative effect of the evidence established the defendant's guilt beyond a reasonable doubt." ' *State* v. *Milardo,* 224 Conn. 397, 402–403, 618 A.2d 1347 (1993); *State* v. *Jarrett,* 218 Conn. 766, 770–71, 591 A.2d 1225 (1991); *State* v. *Weinberg,* 215 Conn. 231, 253, 575 A.2d 1003, cert. denied, 498 U.S. 967, 111 S. Ct. 430, 112 L. Ed. 2d 413 (1990)." *State* v. *Harris,* 227 Conn. 751, 757, 631 A.2d 309 (1993).

The defendants point to a number of inconsistencies in Crummie's trial testimony, his pretrial testimony and his statements to the police. They claim that these inconsistencies render his testimony incredible as a matter of law. Many of the inconsistencies concern collateral matters such as his age and education. Others concern more important matters such as the time of the shootings and whether Crummie had ever seen the defendant White prior to the day of the shootings. All of the inconsistencies were fully explored before the jury on cross-examination. Further, the trial judge specifically instructed the jury that it should take Crummie's prior inconsistent statements into account when considering his credibility: "You should consider . . . if any plausible explanation exists for the difference between or the inconsistency between the statement and his testimony. You will consider those prior or that prior inconsistent statement in determining what weight you will accord to the testimony of that witness. . . . [Once] a prior inconsistent statement . . . is admitted . . . it is up to the jury to determine what weight to give to such statement."

In convicting the defendants, the jury presumably believed Crummie's testimony. The defendants nevertheless urge this court to hold, as a matter of law, that no rational trier of fact could credit Crummie's testimony in light of the inconsistencies it contained. We have stated many times, however, that "[w]e do

not sit as a thirteenth juror who may cast a vote against the verdict based upon our feeling that some doubt of guilt is shown by the cold printed record. . . . Rather, we must defer to the jury's assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude.'' (Citations omitted; internal quotation marks omitted.) *State* v. *Henning,* 220 Conn. 417, 420, 599 A.2d 1065 (1991); see also *State* v. *Salz,* 226 Conn. 20, 30, 627 A.2d 862 (1993); *State* v. *King,* 216 Conn. 585, 602, 583 A.2d 896 (1990).

In considering a similar claim in *State* v. *Hart,* 198 Conn. 424, 427, 503 A.2d 588 (1986), we stated: ''The defendant misperceives the scope of our factual inquiry on appeal. 'This court does not retry the case or evaluate the credibility of the witnesses.' *State* v. *Amarillo,* supra, [198 Conn. 289]. 'The credibility of witnesses is a matter to be resolved solely by the jury.' *State* v. *Myers,* 193 Conn. 457, 473, 479 A.2d 199 (1984); *State* v. *White,* 155 Conn. 122, 123–24, 230 A.2d 18 (1967). 'This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict.' *State* v. *Stankowski,* 184 Conn. 121, 127, 439 A.2d 918, cert. denied, 454 U.S. 1052, 102 S. Ct. 596, 70 L. Ed. 2d 588 (1981).'' See also *State* v. *Anonymous (83-FG),* 190 Conn. 715, 722, 463 A.2d 533 (1983) (inconsistencies do not render a witness' testimony incredible as a matter of law); *State* v. *Taborsky,* 139 Conn. 475, 482, 95 A.2d 59 (1953) (credibility of a witness' testimony is within the province of the jury).

While the inconsistencies in Crummie's story are troubling, we cannot conclude that no rational trier of fact could credit his testimony. Unlike this court, which is limited to the printed record, the jury was able to observe Crummie's conduct, demeanor and attitude while testifying. Further, the inconsistencies were fully explored by defense counsel on cross-examination, and

the trial court specifically instructed the jury that it should consider Crummie's prior inconsistent statements in evaluating his credibility. Under these circumstances, we refuse to usurp the role of the jury and discredit Crummie's testimony as a matter of law.

B

We also briefly address the defendants' claim that the trial court improperly allowed them to be shackled.[15] At the start of pretrial proceedings, the sheriffs recommended to the court that the defendants be placed in leg irons. The trial court acquiesced in this recommendation because "security was their problem, not mine." The defendants objected and requested, pursuant to Practice Book § 892,[16] to question the sheriffs about their recommendation in order to create a record. The trial court refused this request and the defendants excepted. The record clearly indicates, and the state concedes, that the trial court "acquiesced" in the judgment of the sheriffs: "The court didn't order [the leg irons]. The court ordered the sheriffs to make sure the courtroom is secured. The sheriffs feel they require leg irons . . . ."[17] The defendants renewed their objections to the shackling on several occasions. Both before and during the trial, the defendants filed affi-

---

[15] Although we hope that this issue will not arise again on remand, we feel compelled to address it because it involves a flagrant violation of the defendants' constitutional rights and could arise again in the absence of discussion by this court.

[16] Practice Book § 892 provides in relevant part: "Reasonable means of restraint may be employed if the judicial authority finds such restraint reasonably necessary to maintain order. If the judicial authority orders such restraint, he shall enter into the record of the case the reasons therefor."

[17] When pressed to place on the record a reason for the leg irons, the trial court stated: "Because I feel they are charged with a very serious crime. If convicted, they could be given the sentence of death. I have two females that are less than ten feet from them. I, myself, am less than twelve feet from them, and I don't want any problems, and I'm going to make sure there [are] no problems. . . . I want it noted that leg irons are required in this case, that I as a Superior Court judge feel that way while I have

davits stating that the shackling caused them pain and humiliation, and interfered with their ability to communicate with counsel.

In *State* v. *Tweedy*, 219 Conn. 489, 505–506, 594 A.2d 906 (1991), we discussed the standard for reviewing a shackling claim: "As a general proposition, a criminal defendant has the right to appear in court free from physical restraints. . . . Grounded in the common law, this right evolved in order to preserve the presumption favoring a criminal defendant's innocence, while eliminating any detrimental effects to the defendant that could result if he were physically restrained in the courtroom. . . . Nonetheless, a defendant's right to appear before the jury unfettered is not absolute. . . . A trial court may employ a reasonable means of restraint upon a defendant if, exercising its broad discretion in such matters, the court finds that restraints are reasonably necessary under the circumstances. . . . In reviewing a shackling claim, our task is to determine whether the court's decision to employ restraints constituted a clear abuse of discretion. . . . While appellate review is

to work in this facility with these facilities in this particular courtroom." Defense counsel argued that these reasons were insufficient because they were unrelated to the defendants' potential for violent or disruptive behavior.

Although we recognize the importance of courtroom safety, we leave to another day the question of whether factors unrelated to a particular defendant's behavior, standing alone, may constitutionally justify the use of restraints. We need not address this issue because it is clear from the record that the trial court acquiesced in the sheriffs' recommendation and did not truly exercise any independent judgment.

Similarly, we need not address the state's argument that the shackling of the defendant Watkins was justified, in part, by the state's introduction of evidence that Watkins had been charged with assaulting another inmate while incarcerated. First, the trial court had already allowed both defendants to be shackled prior to the introduction of this evidence. Second, after hearing this evidence, the trial court concluded that *both* defendants should remain shackled, even though this evidence in no way involved the defendant White. It is clear from this that the trial court did not actually rely on the evidence of the assault in deciding whether Watkins should remain shackled.

greatly aided when a court develops the record by conducting an evidentiary hearing concerning the necessity for restraints, such a hearing is not mandatory. . . . A record in some fashion disclosing the justification for using restraints, however, is essential to meaningful appellate review of a shackling claim. . . . Accordingly, a trial court must ensure that its reasons for ordering the use of restraints are detailed in the record." (Citations omitted; internal quotation marks omitted.) See also *State* v. *Canty,* 223 Conn. 703, 719–20, 613 A.2d 1287 (1992).

We conclude that the trial court clearly abused its discretion in "acquiescing" in the sheriffs' recommendation that the defendants should be shackled. While we have indicated that the trial court may rely heavily on the advice of security personnel in deciding whether or not restraints are reasonably necessary; *State* v. *Canty,* supra, 223 Conn. 719; *State* v. *Tweedy,* supra, 219 Conn. 506; we have at the same time made clear that the trial court may not rely blindly on such advice. In *State* v. *Canty,* supra, 720, we held that the trial court abused its discretion in relying on the sheriff's "bald, unsupported" opinion that security rules required restraints in "cases such as" the defendant's. See also *State* v. *Tweedy,* supra, 506 (representation that sheriff has supplied "reliable" information "to the effect" that restraints are necessary is insufficient to establish reasonable necessity; trial court must place specific information prompting its decision to restrain the defendant on the record and allow the defendant to respond to the information). The fact that we are remanding both cases on other grounds makes it unnecessary for us to consider the state's argument that any abuse of discretion was nevertheless harmless and does not require a new trial.

## III

White raises three separate claims that we must address. He claims that the trial court improperly: (1) refused to suppress Crummie's lineup identification of him; (2) refused to suppress Crummie's photographic identifications of him; and (3) refused to sever his trial from that of Watkins.

### A

White claims that the trial court should have granted his pretrial motion to suppress evidence of Crummie's lineup identification of him because his temporary removal from the Bridgeport correctional center, where he was being held on unrelated charges, to the Bridgeport police station for a lineup was illegal. We agree.

The following additional facts are relevant to this claim. At a pretrial hearing, it was revealed that White was removed from the Bridgeport correctional center and transported to the Bridgeport police department for the May 16, 1988 lineup pursuant to a "Motion for Order of Temporary Removal." White had been admitted to the correctional center pursuant to a continuance mittimus dated May 10, 1988, from the Norwalk Superior Court. The mittimus indicated that White was being held in lieu of $250,000 bond on charges pending in the Norwalk judicial district.

The "Motion for Order of Temporary Removal" was signed by state's attorney Donald Browne. It stated that Crummie had tentatively identified White from a photographic array as the man who had shot him, but that Crummie "had a very slight doubt and would like to see the suspect in person." The motion requested that White be transported from the correctional center to the police department on May 16, 1988, "for the pur-

pose of a lineup." The trial court, *Curran, J.,* granted the motion. White was not provided with counsel at the lineup.

Prior to trial, counsel for White filed a motion to suppress Crummie's identification of White at the May 16, 1988 lineup. The motion asserted that the order for temporary removal was illegal and that the court had no authority to grant the state's motion. The trial court rejected this argument and refused to suppress the lineup identification. The defendant excepted to this ruling. At trial, Crummie testified that he had identified White at the lineup.

The state conceded at trial that there is no express authority under Connecticut law for the temporary removal procedure that was used to transport White to the police department for the lineup. The state nevertheless contends that the seizure of White pursuant to the temporary removal order was legal. We disagree.

The state relies principally on cases such as *United States* v. *Anderson,* 490 F.2d 785 (D.C. Cir. 1974), and *United States* v. *Sechrist,* 640 F.2d 81 (7th Cir. 1981). These and other cases have held that the fourth amendment to the United States constitution[18] does not require that a warrant be obtained before a suspect who is being detained on one charge can be placed in a lineup concerning an unrelated crime.[19] Even assuming

---

[18] The fourth amendment to the United States constitution provides in relevant part: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."

[19] We note that in many of these cases, the defendant was provided with counsel at the lineup. See, e.g., *Rigney* v. *Hendrick,* 355 F.2d 710, 712 (3d Cir. 1965), cert. denied, 384 U.S. 975, 86 S. Ct. 1868, 16 L. Ed. 2d 685 (1966); *People* v. *Hodge,* 189 Colo. 189, 526 P.2d 309 (1974); *State* v. *Hall,* 93 N.J. 552, 461 A.2d 1155, cert. denied, 464 U.S. 1008, 104 S. Ct. 526, 78 L. Ed. 2d 709 (1983). Indeed, article 170 of the American Law Institute's Model Code of Pre-Arraignment Procedure sets forth procedures

that these cases correctly construe the federal constitution, however, we nevertheless conclude that the seizure of White was illegal under article first, § 9, of our state constitution,[20] and therefore do not reach his other claims.[21]

for placing suspects in lineups that include the right of the accused to have counsel at the lineup. See A.L.I., Model Code of Pre-Arraignment Procedure § 170.3 (m) and commentary.

[20] Article first, § 9, of the Connecticut constitution provides: "No person shall be arrested, detained or punished, except in cases clearly warranted by law."

We recognize that, although White argued that his lineup identification should be suppressed because there was no authority for the temporary removal order under Connecticut law, he did not expressly raise article first, § 9, in his pretrial suppression motion. He nevertheless claims review under *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989). In *Golding*, we held that "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* four of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) Id., 239–40.

We conclude that the conditions of *Golding* have been met. As to the first two conditions, the record clearly is adequate for review, and the defendant is claiming a violation of fundamental rights under the state constitution. The fourth condition need not be considered because the state does not claim that any alleged error was harmless. As to the third condition, this court has held that where evidence that is the fruit of an illegal search or seizure leads to a defendant's arrest and is used against the defendant at trial, the defendant is deprived of a fair trial. *State* v. *Fleming*, 198 Conn. 255, 262, 502 A.2d 886, cert. denied, 475 U.S. 1143, 106 S. Ct. 1797, 90 L. Ed. 2d 342 (1986); *State* v. *Federici*, 179 Conn. 46, 61–62, 425 A.2d 916 (1979). White was arrested immediately after the lineup and evidence of the lineup was used against him at trial. Therefore, if we conclude, on the merits, that the defendant's seizure was a clear constitutional violation and that the lineup is the fruit of that illegal detention, the third condition of reviewability will have been met.

[21] Specifically, we do not reach White's claim that his compelled temporary removal for the lineup constituted an unreasonable seizure under the fourth amendment to the United States constitution and under article first, § 7, of the Connecticut constitution, which provides in relevant part: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures." Despite the state's concession that it would

In *State* v. *Lamme,* 216 Conn. 172, 178–79, 579 A.2d 484 (1990), we reviewed the history of article first, § 9: "The precise language of the present section was originally adopted as article first, § 10, of the Connecticut constitution of 1818. Prior to 1818, Connecticut's declaration of rights took the form of a statutory enactment dating back to the preamble to Ludlow's Code of 1650. That preamble provided that 'no mans life shall bee taken away . . . no mans person shall bee arrested, restrained, banished, dismembered nor any way punished . . . under colour of Law or countenance of Authority, unless it bee by the vertue or equity of some express Law of the Country warranting the same, established by a General Courte, and sufficiently published, or in case of the defect of a law in any perticular case, by the word of God.' 1 Public Records of the Colony of Connecticut 509 (J.H. Trumbull Ed. 1850). This text survived with only minor changes until its last codification before the adoption of the constitution, in the 1808 Public Statute Laws of Connecticut. At that time, the final clause of the preamble read: 'unless clearly warranted by the laws of this state.' Public Statute Laws of the State of Connecticut (1808), Title I, 2." We also noted that in *Jackson* v. *Bulloch,* 12 Conn. 38, 43 (1837), "[t]he only case decided reasonably contemporaneously with the adoption of the 1818 consti-

have needed a warrant had the defendant been free on bail, we also decline to decide whether the temporary removal of White, who was incarcerated because he was unable to make bail, violated the equal protection provisions of the state and federal constitutions. Another claim raised by White is that the lineup identification should have been suppressed because he was not provided with counsel as required by the sixth amendment to the United States constitution and article first, § 8, of the Connecticut constitution. We note that, because White had not been charged with nor even arrested for the shootings at Blake's Market at the time of the lineup, *Kirby* v. *Illinois,* 406 U.S. 682, 92 S. Ct. 1877, 32 L. Ed. 2d 411 (1972), appears to preclude his claim under the sixth amendment. But cf. *People* v. *Coates,* 74 N.Y.2d 244, 543 N.E.2d 440, 544 N.Y.S.2d 992 (1989). While article first, § 8, of our state constitution may provide a greater level of protection than the sixth amendment, we decline to reach this issue.

tution," this court construed the phrase " 'warranted by law' as having a statutory referent similar to that expressly contained in the pre-1818 statutory declaration of rights." *State* v. *Lamme,* supra, 180, 180–81.

Since *Jackson* v. *Bulloch,* supra, 12 Conn. 38, our case law under article first, § 9, has continued to emphasize "the central role of statutory safeguards in implementing the constitutional right of personal liberty." *State* v. *Lamme,* supra, 216 Conn. 181. For example, in *Cinque* v. *Boyd,* 99 Conn. 70, 94, 121 A. 678 (1923), this court held that a boy who had been adjudicated a delinquent in Juvenile Court and confined to a reform school had to be released while his appeal was pending. The applicable statute provided that a juvenile could be admitted to bail pending a hearing before the Juvenile Court, but was silent on the issue of bail pending an appeal. Id., 92. This court concluded that because there was no express provision in the applicable statute for detention pending an appeal, "there was no warrant of law for such detention" and the boy had to be released. Id., 94.

Similarly, in *State* v. *Carroll,* 131 Conn. 224, 227–29, 38 A.2d 798 (1944), this court held that a police officer could be charged with manslaughter for having used force to consummate a warrantless arrest under circumstances unauthorized by the applicable statute. Despite the broader reach of common law authority to arrest, and despite the apparent reasonableness of the officer's actions, this court characterized the officer's attack on his victim as a violation of the victim's rights under article first, § 9. Id., 231. The basis for the constitutional violation was the officer's failure to comply strictly with the limitations imposed by statute: "[T]he purpose of the close restriction upon arrests without warrants is to protect the liberty of the innocent. We cannot say that the legislature adopted a wrong policy when it weighed that liberty against the possibility that

some guilty person might escape." Id.; see also *Sims* v. *Smith,* 115 Conn. 279, 281–83, 161 A. 239 (1932).

Our article first, § 9 jurisprudence was further developed in *State* v. *Lamme,* supra, 216 Conn. 172. In *Lamme,* we held that article first, § 9, does not forbid the type of brief investigative detention that the United States Supreme Court held is constitutional without probable cause in *Terry* v. *Ohio,* 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). We rejected the defendant's argument that article first, § 9, "mandates a universal probable cause standard whenever the police restrain personal freedom to any degree." *State* v. *Lamme,* supra, 177. Because there was common law authority for *Terry*-type activities by the police and this authority had not been superseded by the legislature or the courts, we concluded that *Terry* stops were "clearly warranted by law" and that the defendant's detention was therefore legal. Id., 180–83.

In the case before us, the state concedes that the temporary removal order did not comply with the statutory requirements for an arrest warrant or search warrant,[22] and that there is no other express author-

[22] General Statutes § 54-2a provides in relevant part: "(a) In all criminal cases the superior court, or any judge thereof, may issue (1) bench warrants of arrest upon application by a prosecutorial official if the court or judge determines that the affidavit accompanying the application shows that there is probable cause to believe that an offense has been committed and that the person complained against committed it."

General Statutes § 54-33a (b) provides: "Upon complaint on oath by any state's attorney or assistant state's attorney or by any two credible persons, to any judge of the superior court, that he or they have probable cause to believe that any property (1) possessed, controlled, designed or intended for use or which is or has been used or which may be used as the means of committing any criminal offense; or (2) which was stolen or embezzled; or (3) which constitutes evidence of an offense, or that a particular person participated in the commission of an offense, is within or upon any place, thing or person, such judge, except as provided in section 54-33j, may issue a warrant commanding a proper officer to enter into or upon such place or thing, search the same or the person and take into his custody all such property named in the warrant."

ity under Connecticut law for process compelling a pre-trial detainee to participate in a lineup on an uncharged crime.[23] In contrast to *Lamme,* the state in this case has failed to identify any common law authority for the temporary removal procedure. Furthermore, this court has previously negated any suggestion of implied authority by indicating that the temporary seizure of prisoners by the police for investigative purposes is illegal.[24]

---

[23] Practice Book § 775 et seq. set forth a procedure for compelling an individual charged with a crime to participate in lineups and other investigatory procedures concerning that crime. Section 776 provides: "Upon motion of the prosecuting authority, the judicial authority by order may direct a defendant to participate in a reasonably conducted procedure to obtain nontestimonial evidence under Sec. 775, if the judicial authority finds probable cause to believe that:

"(1) The evidence sought may be of material aid in determining whether the defendant committed the offense charged; and

"(2) The evidence sought cannot practicably be obtained from other sources." This procedure does not apply to White, however, because the lineup was not sought in connection with the offense with which he had been charged.

Also inapplicable are General Statutes § 54-1f, governing warrantless arrests, and General Statutes § 18-81a, which provides: "Whenever any writ of habeas corpus ad testificandum or ad prosequendum or ad respondendum has been issued at the request of a prosecuting attorney or state's attorney for any person in the custody of the commissioner of correction, said commissioner shall either arrange to transport, produce and maintain custody of such person, or said commissioner, with the consent of another state or municipal agency, may arrange to place the person in the charge of such other state or municipal agency which will transport, produce and maintain custody of such person, to, from and at the place specified in such writ."

[24] In *State* v. *Rogers,* 143 Conn. 167, 170–71, 120 A.2d 409, cert. denied, 351 U.S. 952, 76 S. Ct. 850, 100 L. Ed. 1476 (1956), the defendant was placed in the New Haven county jail on January 13, 1954, on attempted robbery and other charges under a duly issued mittimus. On January 30, he was transported from the jail to the state's attorney's office and questioned by the police concerning an unrelated robbery and murder. He then gave a statement to the police that was later admitted at trial. The next day, the defendant was taken to the coroner's office where he made another statement concerning the murder that was admitted into evidence at trial. Id., 171. We held that the removal was illegal because "[p]roper court authorization should have been secured before the defendant was removed from

The state nevertheless contends that the seizure of the incarcerated defendant pursuant to the temporary removal order was legal, even though "not clearly warranted by law," because it was analogous to a *Terry* stop. The state concedes that, had the defendant not been incarcerated, compelling him to participate in a lineup at the police station would have exceeded the permissible bounds of a *Terry* stop.[25] The state claims, however, that because the defendant was already incarcerated, his detention for the lineup intruded only minimally on his liberty and therefore was constitutionally permissible. We disagree.

We have long held that "[p]resentenced detainees have all the constitutional rights of members of society except those incident to their custody for safekeeping prior to judgment." *Laden* v. *Warden,* 169 Conn. 540, 547, 363 A.2d 1063 (1975). Under our state constitution, this includes the right not to be compelled to participate in police investigatory procedures unless "clearly warranted by law." While the fact that a person is incarcerated may be relevant to evaluating the

the jail." Id., 173–74; see also 2 Z. Swift, Digest of the Laws of the State of Connecticut (1823) p. 395 (once an arrestee is committed to jail under a mittimus, the jailer must "keep him till discharged in due course of law").

Similarly, in *State* v. *Traub,* 150 Conn. 169, 173, 177, 187 A.2d 230 (1962), vacated, 374 U.S. 493, 83 S. Ct. 1899, 10 L. Ed. 2d 1048 (1963), the police removed the defendant from the jail, where he was being held on a breach of the peace charge, in order to give him a lie detector test and question him concerning fires which the police suspected he might have set. Id., 173, 177. Although this court did not have to decide the issue, we concluded that the defendant's removal from the jail "may have been technically illegal," even though there was evidence that it was "authorized by an order of the judge of the Police Court of Hartford." Id., 178; see also *State* v. *Traub,* 151 Conn. 246, 248, 196 A.2d 755 (1963), cert. denied, 377 U.S. 960, 84 S. Ct. 1637, 12 L. Ed. 2d 503 (1964) (adhering to the view that the removal of the defendant was probably technically illegal).

[25] This concession is consonant with *State* v. *Edwards,* 214 Conn. 57, 570 A.2d 193 (1990), in which this court recognized that there is a fundamental difference between a brief investigative detention and the transportation of a suspect to the police station for investigative purposes.

"reasonableness" of a seizure under article first, § 7, or the fourth amendment, it is not necessarily disposi- tive of that person's independent claim under article first, § 9. Accordingly, we conclude that the detention of White for the lineup, although accomplished by the state acting with good intentions in an effort to com- ply with the law, clearly was not warranted by law and therefore violated White's constitutional rights under article first, § 9, of our state constitution.

Evidence that is the fruit of an illegal arrest or deten- tion must be suppressed pursuant to our state consti- tution. *State* v. *Oquendo,* 223 Conn. 635, 660, 613 A.2d 1300 (1992); *State* v. *Traub,* 151 Conn. 246, 250, 196 A.2d 755 (1963), cert. denied, 377 U.S. 960, 84 S. Ct. 1637, 12 L. Ed. 2d 503 (1964); cf. *Wong Sun* v. *United States,* 371 U.S. 471, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963). This principle applies to evidence of an iden- tification made during a period of illegal detention. *United States* v. *Edmons,* 432 F.2d 577, 584 (2d Cir. 1970); *Adams* v. *United States,* 399 F.2d 574, 577 (D.C. Cir. 1968); *State* v. *Oquendo,* supra; cf. *State* v. *Villa- fane,* 171 Conn. 644, 654–56, 372 A.2d 82 (1976), cert. denied, 429 U.S. 1106, 97 S. Ct. 1137, 51 L. Ed. 2d 558 (1977); see generally A. Spinella, Connecticut Criminal Procedure (1985) p. 236; 1 W. LaFave & J. Israel, Criminal Procedure (1984) pp. 752–53.[26] Because the stated purpose of the illegal seizure of the defend- ant was for a lineup, the state cannot and does not

---

[26] *United States* v. *Crews,* 445 U.S. 463, 100 S. Ct. 1244, 63 L. Ed. 2d 537 (1980), in no way undermines this result. In *Crews,* the defendant was photographed during a detention at the police station. This photograph was placed in an array and shown to two crime victims, both of whom selected the defendant's photograph. The defendant was then taken into custody and placed in a lineup, at which both victims again identified him. The trial court held that the detention at the police station was illegal and that both the photographic identifications and the lineup identifications of the defend- ant had to be suppressed as fruits of this illegality. The trial court held, however, that the victims would be permitted to identify the defendant at

argue that Crummie's identification of White at the lineup was attenuated from the illegal seizure and purged of its taint. Therefore, we conclude that the trial court improperly refused to suppress evidence of Crummie's lineup identification of White. This evidence should be excluded at the new hearing on probable cause and any retrial of White.[27]

---

trial because the ability of each to identify the defendant was based on their independent recollection of the crime and was not tainted by the intervening identifications. Id., 466–68.

On appeal, the District of Columbia Court of Appeals held that the in-court identifications should have been suppressed as well because they were fruits of the illegal detention. The United States Supreme Court reversed. Id., 468–70. The court held that the in-court identifications were admissible because they were independent of and untainted by the illegal detention. Id., 471–73. A plurality of the court rejected the defendant's claim that an in-court identification could not be permitted under any circumstances, because his physical presence in court was the result of his initial illegal detention. Id., 474–75, 477–79.

White does not claim that Crummie should have been barred from making an in-court identification of him because of the illegal lineup. Further, Crews in no way undermines our conclusion that the lineup identification of White, which was the product of and express purpose for his illegal detention, must be suppressed. To the contrary, Crews actually lends support to this conclusion. See id., 472, 473 n.18.

[27] White does not claim that the charges against him should be dismissed pursuant to State v. Federici, 179 Conn. 46, 425 A.2d 916 (1979). In Federici, we held that where a defendant's arrest is tainted by an illegal seizure of evidence that is later introduced at trial, the defendant is deprived of a fair trial and the charges against him must be dismissed. Id., 61. The admission of Crummie's lineup identification of White during a period of illegal detention deprived defendant White of a fair trial. We want to make clear, however, that in this case, dismissal of the charges is not warranted. In Federici, once the illegally seized evidence was excluded, there simply was nothing to establish probable cause that the defendant had committed the crime. Therefore, dismissal of the charges and release of the defendant from custody were constitutionally mandated. Id., 62. In contrast, in the case before us, the state may be able to establish that Crummie's photographic and in-court identifications of White are independent of the lineup identification and therefore admissible at a new trial. Because the state may still be able to establish sufficient probable cause to try White, a dismissal of the charges would be premature. See State v. Ostroski, 201 Conn. 534, 556, 518 A.2d 915 (1986).

## B

In light of our conclusions, supra, that exculpatory materials were improperly withheld and that the lineup identification of White should have been suppressed, we decline to reach White's claim that Crummie's photographic identifications of him should have been suppressed. As previously discussed, Crummie did not sign the photographs of White that he had identified until after the lineup because he was not positive about his identification. Also, at the pretrial suppression hearing, White did not have Crummie's statement to the police that he probably would not recognize the man who had shot him if he saw him again. On remand, White will have this statement available to him. Further, he will be able to argue that the photographic identifications should be suppressed because they were tainted by the illegal lineup. Because of these likely differences between White's claim as presented to this court, and the claim as it would be presented at retrial, we decline to consider it.

## C

Finally, we consider White's claim that the trial court improperly refused to sever his trial from that of Watkins. White moved before trial for severance on the basis that Watkins was going to present an alibi defense while he was not. White claimed that a joint trial with Watkins would prejudice him because it would emphasize his lack of an alibi defense.[28] The trial court denied this motion. During trial, White again moved for severance on the basis that Zaida Brown's testimony concerning her alleged sighting of Watkins near the crime

---

[28] White's pretrial severance motion also claimed that a joint trial would prejudice him because the state would have twice as many peremptory challenges as it would have had in a separate trial. White claimed that this would give the state "an unfair advantage in determining and designing the composition of his jury in the joint trial." This issue has not been raised on appeal.

scene would not be admissible against White in a separate trial.[29] White claims that Brown's testimony prejudiced him because it corroborated Crummie's identification of Watkins and therefore had bolstered Crummie's credibility before the jury. The trial court refused both to sever the trials and to exclude the testimony. Before this court, White further claims that he was prejudiced by the state's impeachment of Watkins' alibi witnesses, which made it appear that the witnesses were covering for Watkins. White claims that because this impeachment made his codefendant appear guilty, it indirectly prejudiced him as well.

We have long held that "[w]hether to consolidate or sever the trials of defendants involved in the same criminal incident lies within the sound discretion of the trial court. *State* v. *Vinal,* 198 Conn. 644, 649, 504 A.2d 1364 (1986); *State* v. *King,* 187 Conn. 292, 302, 445 A.2d 901 (1982); *State* v. *Holup,* 167 Conn. 240, 244, 355 A.2d 119 (1974); see Practice Book § 829. Ordinarily justice is better subserved where the parties are tried together. *State* v. *Holup,* supra, 244. Joint trials of persons jointly indicted or informed against are the rule, and separate trials the exception resting in the discretion of the court. *State* v. *Castelli,* 92 Conn. 58, 65, 101 A. 476 [1917] . . . . A separate trial will be ordered where the defenses of the accused are antagonistic, or evidence will be introduced against one which will not be admissible against others, and it clearly appears that a joint trial will probably be prejudicial to the rights of one or more of the accused. The test for the trial court is whether substantial injustice is likely to result unless a separate trial be accorded. *State* v. *Varricchio,*

---

[29] Similarly, White objected at trial that the testimony of Barry Skinner, the assistant city engineer in Bridgeport, was prejudicial and would be inadmissible against him in a separate trial. Skinner testified that the area where Zaida Brown lived was approximately 720 feet from Blake's Market. The court required the state to tell the jury that this testimony was being offered as to Watkins only.

176 Conn. 445, 447–48, 408 A.2d 239 (1979). [T]he phrase prejudicial to the rights of the parties means something more than that a joint trial will probably be less advantageous to the accused than separate trials. *State* v. *McCarthy,* 130 Conn. 101, 103, 31 A.2d 921 (1943). In the determination of whether substantial injustice is likely to result from a joint trial or whether such injustice has in fact resulted, an important factor to consider is whether the defenses of the codefendant[s] are incompatible and completely antagonistic to each other. *State* v. *Gordon,* 170 Conn. 189, 190, 365 A.2d 1056 (1976); *State* v. *Holup,* [supra, 246]. *State* v. *Haskins,* 188 Conn. 432, 449–50, 450 A.2d 828 (1982)." (Internal quotation marks omitted.) *State* v. *Walton,* 227 Conn. 32, 56, 630 A.2d 990 (1993).

We conclude that the trial court did not abuse its discretion in denying White's pretrial motion to sever. The trial court concluded that Watkins' alibi defense would be neither incompatible with, nor antagonistic to, any defense of noninvolvement offered by White, and that therefore White would not be prejudiced by a joint trial. We agree that the defenses were consistent and that the motion to sever was therefore properly denied. See *State* v. *McArthur,* 172 Conn. 586, 590, 376 A.2d 58 (1977) (alibi defense consistent with codefendant's claim of nonparticipation in the crime); *State* v. *Johnson,* 28 Conn. App. 645, 652, 612 A.2d 799, cert. denied, 224 Conn. 901, 615 A.2d 1044 (1992) (alibi defense not antagonistic to codefendant's claim of innocence).

We also conclude that the trial court did not abuse its discretion in denying White's motion to sever at trial. White correctly asserts that Zaida Brown's testimony could not have been introduced against him in a separate trial, because the testimony was clearly limited to Watkins. This clear limitation on the testimony also supports the trial court's conclusion, how-

ever, that White would not be prejudiced by its admission at a joint trial. Therefore, there was no abuse of discretion.

In addition to considering whether the trial court abused its discretion in refusing to sever the trials of two or more defendants, this court must consider "whether the denial of the motion for a separate trial has resulted in substantial injustice to the accused." (Internal quotation marks omitted.) *State* v. *Smith,* 201 Conn. 659, 671, 519 A.2d 26 (1986). We conclude that it has not. Brown's testimony only directly corroborated Crummie's identification of Watkins. While this corroboration may have had the incidental effect of bolstering Crummie's credibility to some extent, this does not amount to substantial prejudice.

Similarly, we fail to see how impeachment of Watkins' alibi witnesses could have substantially prejudiced White. The jury is " ' "presumed to follow the court's directions in the absence of a clear indication to the contrary." ' *State* v. *Negron,* 221 Conn. 315, 331, 603 A.2d 1138 (1992)." *State* v. *Raguseo,* 225 Conn. 114, 131, 622 A.2d 519 (1993). The trial court charged the jury at several points that the two defendants "are not to be treated jointly. They are to be treated separately. Consider each case separately, one from the other." Therefore, even if we assume that the impeachment evidence hurt Watkins' case, there is no indication that it played any part in the jury's consideration of White's case.

In essence, White claims that the admission of any evidence that either strengthens a codefendant's case (e.g., an alibi defense) or weakens it (e.g., impeachment) constitutes grounds for severance because of its incidental impact on a codefendant's case. If this were the case, however, joint trials virtually always would be impermissible. As indicated above, it is not enough

for the defendant to show that a joint trial was less advantageous than a separate trial would have been. Rather, the defendant must prove substantial injustice. White has failed to meet this burden.

## IV

Finally, we consider Watkins' separate claim that the trial court improperly refused to suppress Crummie's photographic identification of him on November 19, 1987. Watkins claims that the identification was unnecessarily suggestive because four or five of the six photographs in the array were of people associated with the Java Restaurant in Bridgeport. Watkins argues that this improperly suggested to Crummie that the police thought there was a connection between the Java Restaurant and the shootings. Watkins claims further that this suggestiveness was unnecessary because, instead of assembling the array based on street information, the police could have first obtained a description of the suspect from Crummie and assembled an array based on this description. Watkins therefore claims that the procedure utilized by the police was unnecessarily suggestive. We disagree.

"To determine whether a pretrial identification procedure, such as the photographic array in this case, violated a defendant's due process rights, 'the required inquiry is made on an ad hoc basis and is two-pronged: first, it must be determined whether the identification procedure was unnecessarily suggestive; and second, if it is found to have been so, it must be determined whether the identification was nevertheless reliable based on an examination of the "totality of the circumstances." ' *State* v. *Theriault,* 182 Conn. 366, 371–72, 438 A.2d 432 (1980)." *State* v. *Howard,* 221 Conn. 447, 453, 604 A.2d 1294 (1992); see also *State* v. *Tatum,* 219 Conn. 721, 727, 595 A.2d 322 (1991); *State* v. *Outlaw,* 216 Conn. 492, 501, 582 A.2d 751 (1990). An identifi-

cation procedure is unnecessarily suggestive only if it gives rise to a very substantial likelihood of irreparable misidentification. *State* v. *Outlaw,* supra, 501; *State* v. *Milner,* 206 Conn. 512, 534–35, 539 A.2d 80 (1988); *State* v. *Boscarino,* 204 Conn. 714, 725, 529 A.2d 1260 (1987). The defendant bears the burden of proving both that the identification procedures were unnecessarily suggestive and that the resulting identification was unreliable. *State* v. *Payne,* 219 Conn. 93, 106, 591 A.2d 1246 (1991); *State* v. *Milner,* supra, 535; *State* v. *Boscarino,* supra, 725; *State* v. *Williams,* 203 Conn. 159, 173–74, 523 A.2d 1284 (1987); *State* v. *Aversa,* 197 Conn. 685, 693, 501 A.2d 370 (1985).

The trial court held that the defendant had failed to meet his burden of proving that the photographic array was unnecessarily suggestive and that Crummie's identification was unreliable. We agree with the trial court. " 'The presentation of an array of several photographs to witnesses, including that of the suspect, does not constitute an impermissibly suggestive pretrial identification procedure "in the absence of any unfairness or other impropriety in the conduct of the exhibit." ' *State* v. *Boscarino,* [supra, 204 Conn. 726]." *State* v. *Pollitt,* 205 Conn. 132, 162, 531 A.2d 125 (1987). Watkins has failed to demonstrate any impropriety in the conduct of the photographic array. Crummie's testimony at the suppression hearing indicated that, with the exception of Watkins, he did not associate any of the people in the array with the Java Restaurant. Therefore, the array itself could not have suggested to Crummie a connection between the Java Restaurant and the shootings. The testimony of the police officers and Crummie further indicated that the police did not suggest which picture Crummie should choose, and did not suggest any connection between the shootings and the Java Restaurant. In view of this record, there simply is no evi-

dence that the array was suggestive in terms of focusing Crummie's attention on a particular individual or group of individuals.

Watkins nevertheless urges this court to hold that it is unnecessarily suggestive for the police to assemble a photographic array from street information without first obtaining a description or other information about the suspect from the victim. Watkins claims that doing so is tantamount to telling the victim that the police have developed a suspect through other information and that the suspect is included in the array. We have recognized, however, that crime victims presented with a grouping of photographs often surmise that one of the individuals pictured may be a suspect. This does not invalidate the procedure, however, unless the police expressly indicate that a suspect is included in the array. *State* v. *Williams,* supra, 203 Conn. 177. At the suppression hearing, both the police and Crummie testified that no such indication had been given. Further, although we agree with the defendant that it would have been less suggestive for the police to have obtained a description from Crummie before assembling the array, the defendant has failed to prove that the procedure utilized in this case was unnecessarily suggestive. Crummie testified at the suppression hearing that he had not volunteered information to the police because he feared retaliation from the people involved in the shootings. In light of the seriousness of the crimes, the fact that the perpetrators were at large and Crummie's reluctance to volunteer information, we conclude that the police were justified in assembling an array based on street information and presenting it to Crummie without waiting until they had obtained his description of the suspect. See, e.g., *Simmons* v. *United States,* 390 U.S. 377, 384–85, 88 S. Ct. 967, 19 L. Ed. 2d 1247 (1968) (the FBI was justified in showing photographs of suspects developed through other informa-

tion to witnesses where a serious felony had been committed, the perpetrators were still at large, and it was essential to determine quickly if their investigation was on the right track). Because we conclude that the procedure used to identify Watkins was not unnecessarily suggestive, we need not consider whether Crummie's identification was nevertheless reliable. *State* v. *Tatum,* supra, 219 Conn. 727; *State* v. *Boscarino,* supra, 204 Conn. 726.

The judgments of the trial court are reversed and the cases are remanded for a new hearing on probable cause and other proceedings not inconsistent with this opinion.

In this opinion the other justices concurred.