STATE OF CONNECTICUT *v.* PHILIP F. WIELER II
(11428)
(11429)

DUPONT, C. J., and FOTI and HEIMAN, Js

Argued April 28—decision released July 26, 1994

*Ira B. Grudberg,* with whom was *David A. Leff,* for the appellant (defendant).

*Jack W. Fischer,* assistant state's attorney, with whom, on the brief, were *Michael Dearington,* state's attorney, and *Michael Sullivan,* supervisory assistant state's attorney, for the appellee (state).

HEIMAN, J. The defendant appeals, in appeal number 11428, from the judgment of conviction, rendered after a jury trial, of two counts of larceny in the first degree by embezzlement in violation of General Statutes § 53a-122 (a) (2)[1] and, in appeal number 11429,

---

[1] General Statutes § 53a-122 provides in pertinent part: "(a) A person is guilty of larceny in the first degree when he commits larceny as defined in section 53a-119 and . . . (2) the value of the property or service exceeds ten thousand dollars . . . ."

General Statutes § 53a-119 provides in pertinent part: "LARCENY DEFINED. A person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner. Larceny includes, but is not limited to:

"(1) Embezzlement. A person commits embezzlement when he wrongfully appropriates to himself or to another property in his care or custody."

General Statutes § 53a-118 provides in pertinent part: "(a) The following definitions are applicable to this part . . . (4) To 'appropriate' property of another to oneself or a third person means (A) to exercise control over it, or to aid a third person to exercise control over it, permanently or for so extended a period or under such circumstances as to acquire the major portion of its economic value or benefit, or (B) to dispose of the property for the benefit of oneself or a third person."

The state charged the defendant with appropriation under General Statutes § 53a-118 (a) (4) (B).

from the judgment of conviction rendered after a jury trial of twenty counts of larceny in the first degree by embezzlement in violation of General Statutes § 53a-122 (a) (2)[2] and two counts of larceny in the second degree by embezzlement in violation of General Statutes § 53a-123.[3] On appeal, the defendant claims that the trial court improperly (1) precluded the defendant.from offering evidence that he lacked the criminal intent necessary to commit the crime of larceny by embezzlement and (2) instructed the jury as to the criminal intent necessary to commit the crime of larceny by embezzlement. We affirm the judgment of the trial court.

The jury could reasonably have found the following facts. In 1989, the defendant, Philip F. Wieler II, was the president and sole stockholder of NW Group, Inc., a New Haven based company that provided property management services for various condominium associations throughout Connecticut. The services of NW Group, Inc., included snow removal and repairs, collecting rent, and resolving tenant and owner complaints for the individual client associations. From 1986 to 1989, NW Group, Inc., managed the properties of approximately fifty condominium associations, approximately fifteen of which were owned in whole or in part by the defendant. NW Group, Inc., consisted of four divisions: commercial sales, residential sales, rental, and property management. In addition, NW Group, Inc., maintained both an accounting and a legal department. The accounting department was headed by the

---

[2] The defendant was convicted by the jury of twenty-one counts of larceny in the first degree, but his postverdict motion for judgment of acquittal was granted as to count eleven of the information, thus reducing to twenty the number of counts as to which judgment of conviction entered.

[3] General Statutes § 53a-123 provides in pertinent part: "(a) A person is guilty of larceny in the second degree when he commits larceny as defined in section 53a-119 and . . . (2) the value of the property . . . exceeds five thousand dollars . . . ."

comptroller, Thaddeus Kubow, who had been hired in 1986 by the defendant and the defendant's business partner at the time, Salvatore Nicotra.[4] Kubow worked closely with the defendant who was involved in the day-to-day operations of NW Group, Inc., and who directed Kubow in his activities.

In his position as comptroller of the accounting department, Kubow oversaw the work of various NW Group, Inc., employees. These included a corporate bookkeeper, Lisa Nardello, who worked closely with both Kubow and the defendant. In addition, the accounting department included a payroll clerk, a part-time employee in charge of reconciliation of bank statements, two employees who handled accounts receivable, one employee who handled accounts payable for the properties in which the defendant had an interest, and one employee who handled accounts payable for the remaining properties managed by NW Group, Inc.

The procedure for the management of various condominium associations was in place when Kubow was hired and was not changed. Each property managed by NW Group, Inc., had its own individual checking account. Rents and fees paid on behalf of each individual condominium association were mailed to NW Group, Inc., and deposited into the individual accounts by the employees handling accounts receivable. The checkbooks for each of these accounts were kept by NW Group, Inc., and the bank statements for the accounts were mailed to NW Group, Inc., rather than to the individual condominium associations. Many of the properties also purchased certificates of deposit as reserve funds to meet any large or unusual expenses. These certificates were also held by NW Group, Inc., in a fireproof safe in the accounting department.

---

[4] The defendant and Nicotra were partners in Nicotra-Wieler Management, Inc., the predecessor to NW Group, Inc. In 1987, the defendant purchased Nicotra's interest in the company and renamed it NW Group, Inc.

Bills for expenses incurred by the individual condominium associations were also mailed directly to NW Group, Inc., for payment. Each bill was coded with a three digit identification code and sent to the property manager in the property management division of NW Group, Inc., who handled that individual association. The property manager would review the bill for accuracy and then submit it to the accounting department for payment. At this time, the employees handling accounts payable would enter the amount of the bill into NW Group's computers as an open payable.

Two to three times a month, the accounting department would generate a list of open payables for review by the property managers. The property managers would mark the lists as to which bills were "okay to pay" at that time. Usually, mortgages were paid at the beginning or first "check run" of the month, utilities on the second check run, and miscellaneous invoices on the third check run at the end of the month. The defendant personally reviewed the invoices for the properties in which he had an interest. Once an invoice was marked okay to pay, the accounts payable employees of the accounting department would print out checks from NW Group's central disbursement account. Checks were printed by computer and contained a three digit code that indicated for which of the managed properties the payment was made. The actual invoice being paid was attached to the back of the check for review before signing. The checks were signed by Kubow, William Charbonneau, who was vice-president of NW Group, Inc., or by the defendant. Before the checks were actually paid, the accounting department would also print out a total of the expenses that each property had incurred. That exact amount was withdrawn from the property's individual checking account and placed in NW Group's central disbursement account to reimburse the central account for disburse-

ments made on behalf of each property. Only the funds necessary to cover the expenses of each individual property were withdrawn from that property's account. This central account was also used to pay corporate bills incurred by NW Group, Inc.

During the period between June, 1986, and the end of 1989, properties in which the defendant had an interest began to experience financial difficulties. These properties did not generate sufficient income to pay their bills in full. Despite this, the bills for the defendant's properties were paid. When the individual accounts of the defendant's properties could not reimburse the central account for moneys expended on their behalf, an overdraft would result on the central account. The bank would call Nardello to inform her of the overdraft and give NW Group, Inc., a specified period of time in which to deposit sufficient funds in the account. Nardello would then inform Kubow who was directed by the defendant to withdraw funds from the accounts of properties not owned by the defendant that had large balances. Checks drawn on the accounts of these associations to pay the bills of the defendant's properties were marked "PRE" for "prereimbursement" and were treated as loans. By 1989, the overdrafts were occurring as frequently as four times per week.

The properties managed by NW Group, Inc., but not owned by the defendant, never authorized the defendant to withdraw moneys from their accounts other than to pay bills on their behalf. Nor had any of the properties ever authorized a loan to the defendant. In fact, the properties had no way of knowing about this prereimbursement procedure. Although the individual properties received monthly statements of the activities involving their accounts, these monthly statements were prepared by NW Group, Inc., and did not reflect prereimbursements withdrawn from the accounts. Monthly statements received by the individual condo-

minium associations contained the beginning balance, total income received on their behalf, total bills paid on their behalf, and an ending balance. Because the individual condominium associations did not receive statements from the bank, they did not know that the amounts on the statements from NW Group, Inc., were higher than the amounts actually on deposit in their accounts at the bank.

Throughout 1989, the financial situation of the properties owned by the defendant steadily worsened. Overdrafts occurred more and more frequently. Kubow repeatedly informed the defendant of the seriousness of the problems and began to hold checks that were cut in payment of client association accounts in his desk drawer because he knew sending them out would result in overdrafts.

In July, 1989, the defendant purchased Terrance Cooke & Company, a similar property management company. This purchase increased the number of properties managed by NW Group, Inc., by another thirty-five to forty. By August or September, 1989, the merger of the two companies was complete and all bills were paid out of NW Group's single central disbursement account. Several Cooke employees were retained and became employees of NW Group, Inc., including Laurie Whitney, who continued as assistant comptroller in the accounting department.

On October 25, 1989, Whitney received a telephone call from First National Bank informing her that one of the former Cooke property's accounts was overdrawn. Whitney was surprised and alarmed as this account was normally a very healthy account with a large balance. Whitney asked the bank to fax to her information on the activity on this account. She immediately noticed large, unexplained withdrawals. When Whitney examined the actual checkbooks for the

former Cooke properties, she found that the unexplained withdrawals were marked "PRE." Whitney immediately informed Edward Duval, vice-president of the property management division, who in turn contacted Kubow.

A meeting was called on October 27, 1989, by the defendant, who asked to speak with Whitney alone. The defendant attempted to justify the withdrawals as advances to cover future invoices, but could not explain why the individual properties were not notified. Whitney accused him of stealing the money and the defendant stated that he intended to pay it back.

At about this time, Terrance Cooke, the previous owner of Terrance Cooke & Company, began receiving complaints from vendors that serviced the former Cooke properties. The vendors complained about not having been paid and about having received checks that were returned for insufficient funds. Two checks due Cooke from the defendant for the sale of Terrance Cooke & Company were also returned for insufficient funds. Cooke then received a telephone call from Whitney regarding the events of October 25, 1989.

On November 1, 1989, Cooke and his attorneys met with the defendant. The defendant admitted to the withdrawals but never explained them to Cooke's satisfaction. The defendant insisted that the funds were in other accounts and that it was merely an accounting error that had caused the overdrafts. On November 7, 1989, the defendant entered into a forbearance agreement with Cooke in which the defendant admitted that transfers were made without proper authorization and promised to undertake various immediate steps to restore the funds taken, including setting up a $500,000 escrow account by November 10, 1989, for that purpose.

By November 16, 1989, the escrow account had not been established nor were funds restored as promised. Cooke informed the defendant that he had not met his obligations under the forbearance agreement and that Cooke planned to disclose the problems to the individual condominium associations, beginning with Brookside Condominium Association at a regularly scheduled meeting at 6 that night. Cooke invited the defendant to attend. At that meeting, the defendant informed the Brookside Condominium Association of the problems. He assured the members that it was merely an accounting error and that he would have the funds restored by the end of the year. When pressed by the president of the Brookside Condominium Association, Julie Profetti, to restore the funds by the next day, the defendant reluctantly promised to do so.

On November 17, 1989, the defendant asked Kubow to bring him all of the certificates of deposit held at NW Group, Inc., on behalf of various condominium associations. After reviewing them, the defendant brought two certificates of deposit to Founder's Bank in New Haven to be closed. These certificates of deposit were owned by Breaker Beach Condominium Association, managed by NW Group, Inc., and were purchased with the funds of the Breaker Beach Condominium Association. The face value of the certificates were $20,000 and $75,000. The defendant was authorized to sign the certificates of deposit at the request of the condominium associations as part of the management agreement with NW Group, Inc.

Michelle Piccolo, branch manager of Founder's Bank, informed the defendant that penalties would be incurred by closing the certificates of deposit before their maturity dates. Despite this, the defendant signed and closed the accounts. The total yield from the certificates was $98,583.57. To restore as promised the

funds taken from Brookside Condominium Association, $84,295.95 of the proceeds was wired to them. The remaining funds from the certificates of deposit $14,287.62, were given to the defendant in the form of a check payable to NW Group, Inc., as agent for Breaker Beach Condominium Association.

Also in November, 1989, Virginia Patrick, president of Breaker Beach Condominium Association, became concerned about the financial condition of NW Group, Inc. After speaking with the defendant and Duval, Patrick was not satisfied that the situation was under control. Lucy Colangelo, treasurer of the Breaker Beach Condominium Association, went directly to Founder's Bank to make sure that its certificates of deposit were intact. Colangelo was shown the closed certificates of deposit as well as records of the distribution of their proceeds. She immediately contacted NW Group, Inc., and recovered the check that was made payable to NW Group, Inc., as agent for Breaker Beach Condominium Association. Breaker Beach Condominium Association did not recover the money wired to Brookside Condominium Association. Patrick informed NW Group, Inc., that she or another representative of Breaker Beach Condominium Association would be over the next day to pick up their records, accounts and checkbook held at NW Group, Inc. Patrick then contacted the New Haven police to file a complaint.

At trial, the defendant was precluded from presenting evidence regarding his intent, ability and efforts to repay the moneys taken from the various condominium associations managed by NW Group, Inc. The court held that such evidence was irrelevant because the intent required for the commission of the crime of larceny by embezzlement did not require an intent permanently to deprive the owners of the funds. The defendant was found guilty on all counts in both informations. This appeal followed.

I

The defendant first claims that the trial court improperly excluded evidence of his lack of intent permanently to deprive the condominium associations of their property. We are unpersuaded.

The following additional facts are necessary for a proper resolution of this issue. On March 2, 1992, during the trial, the state abandoned its claim of larceny by embezzlement under General Statutes § 53a-119 (1) against the defendant as defined in General Statutes § 53a-118 (a) (4) (A) and proceeded against the defendant for larceny by embezzlement under General Statutes § 53a-119 (1) as defined in General Statutes § 53a-118 (a) (4) (B).[5] The defendant then sought to introduce evidence showing his lack of intent permanently to deprive the condominium associations of their property. The state objected and the trial court sustained the objection because it found the evidence irrelevant. In the trial court and on appeal, the defendant asserts that the evidence is admissible because his intent permanently to deprive the condominium associations of their property is an essential element of the crime charged.

"[T]here are two components to relevant evidence: materiality and probative value. C. McCormick, Evidence (3d Ed. 1984) § 185, p. 541." *State* v. *Jeffrey,* 220 Conn. 698, 709, 601 A.2d 993 (1991), cert. denied, U.S. , 112 S. Ct. 3041, 120 L. Ed. 2d 909 (1992). " '[E]vidence is relevant if it has a tendency to establish the existence of a material fact.' *State* v. *Mastropetre,* 175 Conn. 512, 517, 400 A.2d 276 (1978). ' "One fact is relevant to another fact whenever, according to the common course of events, the existence of the one, taken alone or in connection with other

---

[5] See footnote 1.

facts, renders the existence of the other either certain or more probable. Unless excluded by some rule or principle of law, any fact may be proved which logically tends to aid the trier in the determination of the issue. . . . No precise and universal test of relevancy is furnished by the law, and the question must be determined in each case according to the teachings of reason . . . .” ’ *State* v. *Sharpe,* 195 Conn. 651, 659, 491 A.2d 345 (1985).” *State* v. *Woodson,* 227 Conn. 1, 16, 629 A.2d 386 (1993).

Here, the evidence would not have the tendency to establish a material fact. The evidence would have the tendency to establish a material fact only if the intent permanently to deprive the associations of their property was an element of the offense. See id. The only issue that remained in the case when the defendant attempted to offer evidence of his lack of intent permanently to deprive the associations of their property was whether the defendant committed larceny by embezzlement in violation of General Statutes § 53a-119 (1) by appropriating the property as defined in General Statutes § 53a-118 (a) (4) (B).

Embezzlement “is a purely statutory offense, rather than a common law crime.” 2 F. Bailey & H. Rothblatt, Defending Business and White Collar Crimes (2d Ed. 1984) § 25:1. Our courts have consistently excluded as an element the intent of the accused permanently to deprive the victims of their property. See *State* v. *MacCullough,* 115 Conn. 306, 312, 161 A. 512 (1932); *State* v. *Parker,* 114 Conn. 354, 365–66, 158 A. 797 (1932). “ ‘Perhaps in a majority of cases the party who violates his trust in such a manner does not expect or intend that ultimate loss shall fall upon the person whose property he takes and misuses. But no hope or expectation of replacing the funds abstracted can be admitted as an excuse before the law. The forger who means to take up the forged paper, the thief who con-

templates making eventual restitution, and the man who embezzles money or bonds with the design of restoring them, all fall under the like condemnation in courts of justice and wherever the rules of sound morality are respected.' " *State* v. *Parker,* supra, 365–66.

The development of the embezzlement statute in Connecticut indicates that the requirement that the accused intend permanently to deprive the victims of their property was added by No. 828, § 120, of the 1969 Public Acts. See General Statutes § 53a-118 (a) (4) (A);[6] General Statutes (Rev. to 1958) § 53-355;[7] General Statutes (1949 Rev.) § 8693;[8] General Statutes (1930 Rev.) § 6365;[9] General Statutes (1918 Rev.) § 6517;[10] General Statutes (1902 Rev.) § 1413.[11] The intent permanently to deprive, however, is only one of two

---

[6] See footnote 1 supra.

[7] General Statutes (Rev. to 1958) § 53-355 provides in pertinent part: "Any . . . private individual, who takes, purloins or secretes, or in any way appropriates to his own use or to the use of others, any . . . moneys . . . in his care or custody . . . with intent to defraud another . . . shall be [punished.]"

[8] General Statutes (1949 Rev.) § 8693 provides in pertinent part: "Any . . . private individual, who shall take, purloin or secrete, or in any way appropriate to his own use or to the use of others, any . . . moneys . . . in his care or custody . . . with intent to defraud another . . . shall be [punished.]"

[9] General Statutes (1930 Rev.) § 6365 provides in pertinent part: "Any . . . private individual, who shall take, purloin or secrete, or in any way appropriate to his own use or to the use of others, any . . . moneys . . . in his care or custody . . . with intent to defraud another . . . shall be [punished.]"

[10] General Statutes (1918 Rev.) § 6517 provides in pertinent part: "Every . . . private individual, who shall take, purloin or secrete, or in any way appropriate to his own use or to the use of others, any . . . moneys . . . in his care or custody . . . with intent to defraud another . . . shall be [punished.]"

[11] General Statutes (1902 Rev.) § 1413 provides in pertinent part: "Every . . . private individual who shall take purloin or secrete, or in any way appropriate to his own use or to the use of others, any . . . moneys . . . in his care or custody . . . with intent to defraud another . . . shall be [punished.]"

alternative theories in the embezzlement statute. The other alternative requires disposal of the property without the intent permanently to deprive the victims of their property. See General Statutes § 53a-118 (a) (4) (B). This alternative is the theory on which the state pursued conviction. It is established that under this theory that "[t]he fact that he intended, and might be able, to replace the [property] entrusted to him with other [property] would not absolve him from guilt; when he sold the [property], [the defendant] placed it beyond his power to restore the [property] to [the victims], and not only did this constitute an unlawful appropriation of it, but it also established his felonious intent to deprive [the victims] of it." *State* v. *MacCullough*, supra, 115 Conn. 312. Thus, evidence tending to show the defendant's lack of intent permanently to deprive the victims of their property was not an element of the offense and not a material fact. See *State* v. *Woodson*, supra, 227 Conn. 16. As such, the evidence was irrelevant and properly excluded by the trial court.

## II

The defendant next claims that the trial court improperly refused to instruct the jury that the state was required to prove he intended permanently to deprive the associations of their property. The defendant requested that the trial court charge the jury that the state was required to prove that the defendant intended permanently to deprive the victims of their property. See General Statutes § 53a-118 (a) (4) (A). The trial court, instead, charged the jury that the state was required to prove only that the defendant disposed of the property. See General Statutes § 53a-118 (a) (4) (B). After completion of the charge, the defendant objected to the charge and took exception. See Practice Book § 852.

" 'Our standard of review in cases when the defendant claims that the instructions [were deficient] is whether . . . it was reasonably possible that the jury was misled.' *State* v. *Wolff,* [29 Conn. App. 524, 530, 616 A.2d 1143 (1992)]; *State* v. *Campbell,* 225 Conn. 650, 661, 626 A.2d 287 (1993). . . . A jury instruction [must provide] the jury with a 'clear understanding of the elements of the crime[s] charged, and affords them proper guidance for their determination of whether those elements were present.' (Internal quotation marks omitted.) *State* v. *Avila,* 223 Conn. 595, 602, 613 A.2d 731 (1992); *State* v. *Plude,* 30 Conn. App. 527, 537, 621 A.2d 1342, cert. denied, 225 Conn. 923, 625 A.2d 824 (1993). . . . 'If justice is to be done . . . it is of paramount importance that the court's instructions be clear, accurate, complete and comprehensible, particularly with respect to the essential elements of the alleged crime[s]. . . .' (Citations omitted; internal quotation marks omitted.) *State* v. *Roque,* [190 Conn. 143, 157, 460 A.2d 26 (1983)]; *State* v. *Wolff,* supra [530]. '[I]n reviewing jury instructions our task is also to view the charge itself as part of the whole trial.' " *State* v. *Lemoine,* 33 Conn. App. 743, 750–51, 638 A.2d 622 (1994).

As we stated previously, the defendant's intent permanently to deprive the associations of their property is not an essential element of the offense of larceny by embezzlement. Thus, there is no reasonable possibility that the trial court's refusal to instruct on it misled the jury.

The judgment is affirmed.

In this opinion the other judges concurred.