# STATE OF CONNECTICUT *v.* RICKY SMITH
## (14398)

Spear, Hennessy and Freedman Js.

Argued January 16—officially released July 2, 1996

*Elizabeth A. Gallagher*, for the appellant (defendant).

*Margaret Gaffney Radionovas*, assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Gary W. Nicholson*, assistant state's attorney, for the appellee (state).

HENNESSY, J. The defendant, Ricky Smith, appeals from the judgment of conviction, after a jury trial, of intentional manslaughter in violation of General Statutes § 53a-55 (a) (1) and carrying a pistol without a permit in violation of General Statutes § 29-35. The defendant claims that the trial court improperly (1) denied his motion to suppress his statement to police, (2) admitted evidence of the exercise of his right to remain silent, (3) admitted evidence pertaining to his uncharged misconduct, (4) denied his motion to suppress testimony regarding a photographic identification and (5) restricted his cross-examination of a witness regarding the issue of the witness' alcoholism and substance abuse. We affirm the judgment of the trial court.

The jury could reasonably have found the following facts. In April, 1992, the defendant and several others were involved in a drug sale operation in an area known as the "Mud Hole" in New Haven. The defendant did not conduct the actual delivery of the drugs, but served as a guard to protect against robbery. On April 13, 1992, the victim, Antoine Wright, walked through the Mud Hole area, confronted an associate of the defendant and yelled something about another group that sold narcotics taking over. The defendant, who was nearby, consulted with another associate, Troy Butler, and then approached the victim. The defendant was carrying a .40 caliber semiautomatic gun, and Butler was carrying a .38 caliber gun. As they approached the victim, he began to run. The defendant, Butler and several others gave chase while firing their weapons. The victim died as a result of gunshots fired from a .40 caliber gun. Shortly after the shooting, the defendant stated: "I got him." Two days later, the defendant went to the police

station and gave a statement concerning the shooting in which he stated that he had been at the scene of the shooting and had fired a gun. Additional facts will be set forth herein as necessary.

I

The defendant first claims that the trial court improperly denied his motion to suppress his statement to the police. He asserts that he did not voluntarily give the statement and that the police failed to advise him adequately of his *Miranda*[1] rights. We disagree.

At a suppression hearing, the defendant presented evidence that he was intoxicated when he went to the police station and, as a result, had difficulty understanding the officers and did not appreciate the gravity of the situation. He claimed that under those circumstances, his statement was involuntary. He also claimed that because he did not feel free to leave the police station and thought that he was under arrest, he was in custody and the police should have read him his *Miranda* warnings. Finally, he claimed that if he did receive the *Miranda* warnings, his waiver of those rights was invalid because he was intoxicated. The state presented evidence that the defendant had gone to the police station voluntarily, that the police did not arrest him, that the defendant was free to leave at any time and that the defendant left the police station without resistance after he terminated the interview. The state also presented evidence that, before the police took any information from him, they advised him of his *Miranda* rights and had him read a statement of those rights. The state also proffered evidence that the defendant understood his rights, signed the bottom of a *Miranda* waiver form and initialed each individual *Miranda* right. A detective who took the defendant's statement testified that he had not observed anything that would

[1] *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

indicate that the defendant was intoxicated. Finally, the state's evidence established that the defendant took ten or fifteen minutes to review his statement, to initial each page and to sign it at the end.

The trial court found that the defendant was not intoxicated when he gave the statement, that he was capable and competent to give the statement and that he gave it "freely, willingly, and voluntarily." The trial court also found that the defendant was not in custody and that "even if by some stretch of the imagination one could say he was in custody . . . the *Miranda* warnings were given and they were given properly and he then thereafter willingly, voluntarily and understandingly waived his . . . constitutional rights and gave the statement."

We first address whether the statement was voluntary. "[T]he use of an involuntary confession in a criminal trial is a violation of due process. . . . The state has the burden of proving the voluntariness of the confession by a fair preponderance of the evidence. . . . [Our Supreme Court has] stated that the test of voluntariness is whether an examination of all the circumstances discloses that the conduct of law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined . . . . The ultimate test remains . . . [i]s the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process. . . . The determination, by the trial court, whether a confession is voluntary must be grounded upon a consideration of the circumstances surrounding it. . . .

"This determination of voluntariness and admissibility, in the first instance, is a question of fact for the

trial court to resolve in the exercise of a legal discretion in accordance with constitutional standards of due process. . . . This, of course, includes decisions on questions of credibility presented to the trial court. . . . Though the question is ultimately factual, our usual deference to fact-finding by the trial court is qualified on the question of voluntariness by the necessity for an independent and scrupulous examination of the entire record to ascertain whether the trial court's finding is supported by substantial evidence. . . .

"[I]n *State* v. *Gonzalez*, 206 Conn. 213, 221–22, 537 A.2d 460 (1988), we noted, quoting from *State* v. *Perry*, 195 Conn. 505, 516, 488 A.2d 1256 (1985), that: The [traditional] test of voluntariness is whether an examination of all the circumstances shows that the conduct of police was such as to overbear the defendant's will to resist and bring about a confession, not freely self-determined. The ultimate question of whether a defendant's will has been overborne, thus resulting in an involuntary statement in a particular case, involves, as noted, an assessment of the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation. . . . Some of those also taken into account, upon a proper factual showing, include: the youth of the accused; his lack of education; his intelligence; the lack of any advice as to his constitutional rights; the length of detention; the repeated and prolonged nature of the questioning; and the use of physical punishment, such as the deprivation of food and sleep." (Citations omitted; internal quotation marks omitted.) *State* v. *Madera*, 210 Conn. 22, 39–41, 554 A.2d 263 (1989).

A review of the transcript clearly reveals substantial evidence to support the trial court's finding that the defendant gave the statement voluntarily. The state points to the testimony of Detective Joseph Greene, who took the defendant's statement. Greene's testi-

mony established the following. The defendant called the police station regarding the death of Antoine Wright, stating that he wanted to tell his side of the story. The defendant then went to the police station by his own means and cooperated with the police. The defendant did not appear intoxicated or under the influence of drugs, and the police had no problems communicating with him. The police did not place the defendant under arrest, and he was free to leave at any time. When the defendant requested a lawyer, the police terminated the interview and the defendant left the police station. The evidence further established that the defendant was twenty-two years old at the time of the statement, was fairly intelligent and had completed the twelfth grade. Finally, no evidence exists that the police deprived the defendant of food or sleep.

The defendant next challenges the admissibility of his statement on the ground that he was in custody during the questioning and, therefore, should have been read his *Miranda* warnings. He further contends that if he did receive the warnings and did waive them, the waiver was invalid because he was intoxicated. We need not determine whether the trial court properly found that the defendant was in custody because we dispose of the defendant's claim on the basis that the trial court's findings that the police gave the defendant his *Miranda* warnings and that the defendant validly waived those rights were not clearly erroneous.

"To be valid, a waiver must be voluntary, knowing and intelligent. . . . The state has the burden of proving by a preponderance of the evidence that the defendant voluntarily, knowingly and intelligently waived his Miranda rights. . . . Whether a purported waiver satisfies those requirements is a question of fact that depends on the circumstances of the particular case. . . . Although the issue is therefore ultimately factual, our usual deference to fact-finding by the trial court is

qualified, on questions of this nature, by the necessity for a scrupulous examination of the record to ascertain whether such a factual finding is supported by substantial evidence." (Citations omitted; internal quotation marks omitted.) *State* v. *Stanley*, 223 Conn. 674, 686, 613 A.2d 788 (1992). A trial court's findings will be reversed only if they are clearly erroneous. Id., 687.

A review of the evidence in this case reveals that substantial evidence exists to support the trial court's findings that the defendant was not intoxicated, that the police read the defendant his *Miranda* warnings, and that the defendant knowingly, intelligently and voluntarily initialed and signed a waiver of rights form.

After a thorough and scrupulous review of the record, we conclude that the trial court's findings that the defendant made the statement voluntarily, that the police read him his *Miranda* warnings and that the defendant knowingly, intelligently and voluntarily waived his *Miranda* rights were not clearly erroneous.

II

The defendant next claims that the trial court improperly admitted evidence of the exercise of his right to remain silent. The following facts are pertinent to this issue. The defendant went to the police station to give a statement concerning the shooting, and Greene interviewed him concerning the incident. After answering a number of questions the defendant requested an attorney. The interview then ended. At trial, Greene testified that he wanted to ask the defendant more questions, but that the interview ended "[b]ecause Mr. Smith did not want to be further interviewed regarding the shooting." The trial court then instructed the jury that the defendant voluntarily gave the statement and had a right to terminate the interview at any time. The trial court also stated that the jury should draw no adverse inference because he elected to terminate the interview

and that the evidence was proffered "just to show what the investigative efforts were by the police and the sequence of events that took place." The defendant claims that the admission of the testimony concerning his desire to terminate the interview violated his due process rights pursuant to *Doyle* v. *Ohio*, 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976). The state argues that the evidence was proper to show the investigative efforts of the police and the sequence of events.

In *Doyle* v. *Ohio*, supra, 426 U.S. 619, the United States Supreme Court held that "the use *for impeachment purposes* of [a defendant's] silence, at the time of arrest and after receiving *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment." (Emphasis added.) Thus, *Doyle* is not implicated if the evidence is not presented for impeachment purposes. *State* v. *Hull*, 210 Conn. 481, 490–91, 556 A.2d 154 (1989); *State* v. *Casey*, 201 Conn. 174, 182–86, 513 A.2d 1183 (1986); *State* v. *Moye*, 177 Conn. 487, 495–99, 418 A.2d 870, vacated and remanded on other grounds, 444 U.S. 893, 100 S. Ct. 199, 62 L. Ed. 2d 129, on appeal after remand, 179 Conn. 761, 409 A.2d 149 (1979). The state may present evidence "to show the investigative effort made by the police and the sequence of events as they unfolded . . . ." *State* v. *Moye*, supra, 499. In *State* v. *Hull*, supra, 491, our Supreme Court noted that testimony concerning investigative effort that refers to a defendant's postarrest silence is constitutionally permissible "where only one police officer briefly describe[s] what had transpired when [the] defendant was interviewed at the police station."

In this case, the record clearly reveals that the questions regarding the termination of the interview did not seek to impeach the defendant and were focused on the investigative efforts made by the police and the sequence of events. Furthermore, only one police offi-

cer testified concerning what had taken place at the police station. No *Doyle* violation exists on this record.

### III

The defendant next claims that the trial court improperly admitted evidence of uncharged misconduct. Fred Randall, a witness at the trial, testified that the defendant was involved in a drug sale operation and that his role was to protect the group from robbery. The trial court twice instructed the jurors that if they chose to give this evidence any weight, they should use the evidence to show only that the defendant had a motive to be involved in the shooting. The defendant claims that the trial court improperly allowed this testimony because it was based wholly on speculation and was therefore irrelevant. The defendant further claims that because the state introduced no relevant evidence of prior misconduct, the prejudicial effect of the speculation testimony necessarily outweighed its probative value. The state contends that Randall's testimony is based on personal knowledge, is relevant to show motive and has sufficient probative value to outweigh any prejudicial impact.

"[T]here are two components to relevant evidence: materiality and probative value. . . . [E]vidence is relevant if it has a tendency to establish the existence of a material fact. . . . *State* v. *Wieler*, 35 Conn. App. 566, 576–77, 645 A.2d 1032 (1994), aff'd, 233 Conn. 552, 660 A.2d 740 (1995). Evidence of motive is a highly relevant factor for assessing the guilt or innocence of a defendant. *State* v. *Murdick*, 23 Conn. App. 692, 696, 583 A.2d 1318, cert. denied, 217 Conn. 809, 585 A.2d 1233 (1991)." (Citations omitted; internal quotation marks omitted.) *State* v. *Mozell*, 40 Conn. App. 47, 51, 668 A.2d 1340 (1996). "[E]vidence otherwise relevant and material is not rendered inadmissible because it tends to prove that an accused committed other crimes. See *State* v.

*James*, 211 Conn. 555, 578, 560 A.2d 426 (1989). 'It is widely recognized that other misconduct evidence is admissible to prove motive, as an exception to the general prohibition against such evidence.' Id. Nevertheless, prior to ruling on its admissibility the trial court must still consider whether the prejudicial effect of such evidence outweighs its probative value. *State* v. *Sierra*, 213 Conn. 422, 434–35, 568 A.2d 448 (1990). We recognize that this balancing process is an inherently difficult one, and will reverse the trial court's decision only when it is manifest that an abuse of discretion or an injustice has occurred. Id.; *State* v. *Braman*, 191 Conn. 670, 676, 469 A.2d 760 (1983)." *State* v. *Marra*, 215 Conn. 716, 738, 579 A.2d 9 (1990).

While Randall never saw the defendant sell drugs or avert an attempted robbery, his testimony regarding the defendant's involvement in a drug operation was based on his observations and personal knowledge. Randall testified on the basis of his personal knowledge that the defendant was involved in drug activity in the Mud Hole area with at least three other people.[2] Randall also

---

[2] During the direct examination of Randall, the state elicited the following testimony that establishes the defendant's involvement in a drug operation:

"Q. During the time period immediately prior to the shooting were you aware from your own personal knowledge whether or not Mr. Smith, Ricky Smith, was involved in any sort of drug activity in the area of Mud Hole?

"A. Yes.

"Q. Was he, Mr. Smith, associated with any particular brand of drug that was being sold in that area?

"A. Double Staple.

"Q. Was he at that time working with other people in that area to distribute this narcotic Double Staple?

"A. Yes.

"Q. Who was he working with?

"A. T-Dog, Cecil and Cheese."

Randall also testified as follows:

"Q. At the time when you would see, again immediately prior to the shooting, we are talking about that period of time, when you would see that type of narcotic, Double Staple, would Ricky and Troy, Cheese and Cecil be in the apartment?

"A. Yes."

offered testimony that based on his observations of the activity in the Mud Hole area that the defendant was a "big boy" or "lieutenant" in the operation.[3] This evidence was highly probative of the defendant's motive and a review of the record reveals that its probative

---

[3] During the direct examination of Randall, the state elicited the following testimony that establishes the defendant's role in the drug operation:

"Q. Let me ask you this. You did tell us that Cecil was the one who was pretty much running the operation Double Staple. What if anything did Troy Butler and Ricky Smith have to do with that operation?

"A. They were just his Home Boys.

"Q. Well, were Ricky Smith and Troy Butler, were they actually involved themselves in hand to hand narcotics sales in the area of Mud Hole?

"A. No, they didn't handle it themselves.

"Q. Who would handle that end of it, of the operation?

"A. Most of the time when they were selling out of Luke's house, Cheese was selling it.

"Q. If Troy Butler and Ricky Smith weren't the head of the operation, and if they were not actually involved in selling it because Cheese was, what did Ricky Smith, what did Ricky Smith and Troy Butler have to do with the sales of drugs in that area?

"A. I don't know what you mean.

"Q. Well, what was their position in that particular operation? What was their function?

"A. They were the big boys. They were the lieutenants. Call them the lieutenants.

"Q. Well, if people came into the area—I will withdraw that. During the time prior to the shooting had you ever seen other people who did not regularly sell drugs in that area come to that area to sell drugs?

"A. No.

"Q: You didn't see that happen?

"A. No.

"Q. Would Troy Butler or Ricky Smith allow the people on the side of Pepper's to sell their drugs on the side of Sonny and Viv's?

"A. No.

"Q. What would they do to stop it?

"A. Whatever they had to, I guess.

"Q. Can you tell the court how you know that Ricky Smith and Troy Butler were so-called lieutenants in this drug operation, how do you know that?

"A. How do I know they were lieutenants?

"Q. Yes.

"A. They were enforcers.

"Q. Did you ever hear any conversations between Ricky Smith, Troy Butler, Cecil and Cheese, did you ever hear them discussing those sorts of matters?

"A. No, I never heard any of them say that Cecil was the big boss

value outweighed its prejudicial effect. Furthermore, the trial court diminished the prejudicial impact of the evidence by instructing the jury that it could use the evidence only to prove a motive. See *State* v. *Sheets*, 40 Conn. App. 328, 334, 671 A.2d 366 (1996). We conclude that the trial court did not abuse it discretion.

## IV

The defendant next claims that the trial court improperly denied the defendant's motion to suppress identification testimony. The state presented the following evidence at the suppression hearing. On the evening of the shooting, Detective Gilbert Burton went to the home of Mary Reeves, who he believed had been at the scene of the shooting. While there, Reeves told Burton that she had seen people chasing a young man down the street. On the next evening, Burton went to Reeves' home with ten photographs and asked her if she recognized anyone from the scene of the shooting. Reeves picked out two photographs, one of the defendant and one of Butler. Burton then asked her whether she had seen those two individuals chasing the victim down the street. She answered yes.

The defendant argues that Burton impermissibly suggested to Reeves that the defendant had been chasing the victim by asking her whether the two individuals whom she had identified were chasing the victim. He claims that because Burton's first question merely asked whether she recognized anyone from the scene without implying involvement, Burton's second question was suggestive because it implied involvement after the defendant's photograph had already been singled out. The state contends that Burton's second ques-

and Troy was the lieutenant or Suave [the defendant] was the lieutenant. It was just—you just look at something and you know that is how it is.

"Q. So that was based on the type of activity you saw going on in the area of the Mud Hole.

"A. Yes."

tion was not impermissibly suggestive when considered in context because the question sought only to confirm that Reeves identified them as the people she had seen chasing the victim the day before. The trial court agreed with the state and found that the procedure was not impermissibly suggestive because Reeves, not Burton, had originally mentioned that people were chasing the victim and because Reeves testified that she identified the photographs of the people she saw running.[4]

"The decision of whether a pretrial identification procedure violates a defendant's due process rights is an ad hoc determination and involves a two-pronged test. *State* v. *White,* 229 Conn. 125, 161, 640 A.2d 572 (1994), quoting *State* v. *Howard,* 221 Conn. 447, 453, 604 A.2d 1294 (1992); see also *State* v. *Arena,* 33 Conn. App. 468, 473, 636 A.2d 398 (1994). The first prong of the test is whether the identification procedure was unnecessarily suggestive. 'An identification procedure is unnecessarily suggestive only if it gives rise to a very substantial likelihood of irreparable misidentification.' *State* v. *White,* supra, 161–62; *State* v. *Arena,* supra, 473–74, quoting *Simmons* v. *United States,* 390 U.S. 377, 384, 88 S. Ct. 967, 19 L. Ed. 2d 1247 (1968). If the trial court finds the procedure unnecessarily suggestive, it proceeds to the second prong to inquire whether, considering the totality of the circumstances, the identification was nevertheless reliable. *State* v. *Theriault,* 182 Conn.

[4] Reeves testified as follows on cross-examination at the suppression hearing:

"Q. Did you pick out Rick Smith's, that triple D state's exhibit—withdrawn. Would it be fair to say that you associated that other photograph, the photograph of Ricky Smith, state's exhibit triple D, because you associated it with the first photograph, state's exhibit double X as someone else you saw at the scene?

"A. I saw those two running. I picked out those two pictures.

"Q. There is no doubt in your mind, is there, that you saw state's exhibit triple D, that person in that photograph, running that day?

"A. Those two people I saw running. Those two people. I picked those two pictures out."

366, 371–72, 438 A.2d 432 (1980). 'The defendant bears the burden of proving both that the identification procedure was unnecessarily suggestive and that the resulting identification was unreliable.' *State* v. *White*, supra, 162; *State* v. *Payne*, 219 Conn. 93, 106, 591 A.2d 1246 (1991)." *State* v. *Owens*, 38 Conn. App. 801, 803–804, 663 A.2d 1094, cert. denied, 235 Conn. 912, 665 A.2d 609 (1995).

The defendant's argument relies on the assertion that Burton's question suggested to Reeves that the defendant was chasing the victim and, therefore, was involved in the incident. The evidence adduced at the suppression hearing does not support that conclusion. The evidence reveals that it was Reeves, not Burton, who first mentioned that people were chasing the victim. Furthermore, the trial court could reasonably have concluded that Reeves selected the defendant's photograph in that context.

The defendant relies on *State* v. *Austin*, 195 Conn. 496, 488 A.2d 1250 (1985), for the proposition that police comment can make an identification procedure impermissibly suggestive.[5] *State* v. *Austin*, supra, 501, focused on whether police comment somehow heightened a witness' interest in an array. In this case, Burton's comments sought only to confirm what the witness had already told him and did nothing to influence her choice. Burton's question was not suggestive and did not give rise to a substantial likelihood of irreparable misidentification.

Therefore, we conclude that the trial court did not improperly find that the defendant failed to prove

---

[5] The defendant also relies on *State* v. *Ramsundar*, 204 Conn. 4, 10, 526 A.2d 1311, cert. denied, 484 U.S. 955, 108 S. Ct. 348, 98 L. Ed. 2d 374 (1987). That case is not relevant to our inquiry because in that case the parties did not dispute that the procedure was impermissibly suggestive, but argued the case under the second prong—totality of the circumstances. Id.

that the identification procedure was impermissibly suggestive.

## V

The defendant's final claim is that the trial court deprived him of his right to confrontation by limiting his questioning of a witness. The following facts are relevant to the disposition of this claim. The defendant attempted to question Reeves concerning whether she had been treated for alcohol abuse and whether that illness or the effects of withdrawal affected her ability to perceive, to recollect or to relate relevant facts. The defendant pursued this line of inquiry during both the identification suppression hearing[6] and

---

[6] At the suppression hearing the following testimony colloquy occurred:

"Q. Ms. Reeves, is it true that you were treated for alcoholism before and after April 13, 1992?

"A. Yes.

"The State: I am going to object.

"The Court: Objection sustained.

"Defense Counsel: Your Honor, I do claim the question.

"The Court: Objection sustained to the question, were you treated before and after for alcoholism.

"Q. Ms. Reeves, did you go to detox for alcoholism in November of 1992?

"The State: I am going to object.

"The Court: Objection sustained.

"Q. Ms. Reeves, at the time of the incident, April 13, 1992, were you an alcoholic?

"The State: I am going to object to the form of the question.

"The Court: Objection sustained.

"Q. Ms. Reeves, at the time of the incident, April 13, 1992, had you had any alcohol to drink that day?

"A. No, I had not.

"Q. In not drinking any alcohol that day would your failure to consume alcohol affect your ability to know or comprehend the things around you?

"A. No, they would not.

"Q. Have you ever gone through the physical symptom known as delirium tremens?

"The State: I am going to object.

"The Court: Objection sustained.

"Q. On April 13, 1992, did you have any type of chemical or alcohol dependency?

"A. No, I did not."

After this line of questioning the court stated the following: "Sir, the fact that the lady may or may not have had to have some type of

trial.[7] The trial court restricted the defendant's questions to Reeves' condition on the date of the shooting, the date of her photographic identification of the defendant, the date of her testimony and reasonable

---

treatment for some alcohol problem seven months after the date of the homicide which she apparently is a witness to, in some respect anyway, in the opinion of this court, does not bear on her ability to see, hear and comprehend on April 13, 1992, or on April 14 when she made the photo identification. That is the reason I have sustained the objection to that question which dealt with something that happened in November. Objection was sustained."

[7] At trial the defense counsel questioned Reeves as follows:

"Q. You testified that you had not been drinking on the day of April 13, 1992, is that correct?

"A. That's correct.

"Q. Now isn't true that as of November, 1992, you had checked yourself into St. Raphael's Hospital because you were having tremors and withdrawals from alcohol?

"The State: I am going to object.

"The Court: Objection sustained. The jury may step into your room, please."

After some discussion the court ruled as follows:

"The Court: Yes, but look, a good place to start, sir, is the date in question, the thirteenth and the fourteenth. And today because she is testifying here today and her ability to recall today is certainly relevant. That's a good place to start. Not to launch into seven months after the incident in question and about a year and a half before today's date to throw into the teeth of this witness in the presence of the jury what amounts to a claim that she had or was suffering from the DTs and she had to go to a hospital about it. Even if it were true, it is improper. You don't take witnesses and put them on the stand and throw mud at them, sir, which is what you are doing. And if it keeps up, I'm going to hold you in contempt.

"Now you have a right to ask her all the questions you want about what her condition was on the thirteenth or fourteenth and within a reasonable time prior to this and thereafter. A reasonable time does not mean you can jump to a date seven months later and say, 'Didn't you check yourself into a hospital on that date for such and such a condition?' You can also ask her about her condition today. You can do that, and within a reasonable time prior to today. Reasonable time. I mean a matter of days, week or two. Not six months ago, not a year ago. Especially into matters to which there is some privilege attached."

The questioning then resumed as follows:

"Q. On April 13, 1992, were you an alcoholic?

"The State: I am going to object to that.

"The Court: The objection is sustained.

"Q. Ms. Reeves, on April 13 of 1992 would you if you didn't take a drink have had a problem in dealing with your own state of mind?

time periods before and after those dates.[8] The trial court stated that the fact that Reeves received treatment seven months after the incident, without more, is inadmissible.

The defendant claims that because Reeves' alcohol abuse treatment did not occur within the time frame set by the trial court, the restriction violated his right to confrontation by preventing him from laying the groundwork necessary for a fair judicial determination on the issue of obtaining evidence of Reeves' mental condition, specifically her ability to recall the events of April 13, 1992.[9] The state contends that the trial court properly limited the questioning to the relevant time periods and that the defendant failed to lay the foundation necessary to make those events that fell within the proscribed time periods relevant.

The defendant relies on *State* v. *D'Ambrosio*, 212 Conn. 50, 561 A.2d 422 (1989), cert. denied, 493 U.S. 1063, 110 S. Ct. 880, 107 L. Ed. 2d 963 (1990). In *State* v. *D'Ambrosio*, supra, 54–55, the defendant claimed that the trial court had violated his right of confrontation by denying him access to a witness' psychiatric records, which he claimed were probative

---

"A. No.

"Q. Today as you sit here are you enrolled in any out-patient clinics of any kind?

"A. No."

[8] See footnotes 6 and 7.

[9] The defendant also claims that he "attempted to but was prevented from making the threshold showing that the records would reveal that, at the relevant time, Reeves' alcohol dependency problem, for which she sought treatment on several occasions, may have impaired her perception in memory." A review of the transcript reveals that the defendant never presented any records for admission nor requested that the trial court give him access to any records. Rather, the defendant sought to cross-examine the defendant concerning her alleged hospitalizations for alcohol treatment because he believed that her history of alcohol and substance abuse affected her ability to know and recall at trial what happened on April 13, 1992.

of the witness' ability to perceive and to recall facts. Our Supreme Court concluded that a defendant must be allowed to attempt to show that a reasonable ground exists to believe that the lack of the records would likely impair his right to impeach the witness. Id., 58. If the defendant meets that preliminary showing, the trial court must examine the records to determine whether they are in fact "probative of the witness' capacity to relate the truth or to observe, recollect and narrate relevant occurrences." Id. Similarly, evidence of a witness' mental condition may be admitted if the defendant establishes that a relationship exists between the condition and the defendant's capacity to observe, remember and narrate the relevant facts. *State* v. *Cardinal*, 194 Conn. 114, 118–19, 478 A.2d 610 (1984). Absent such a showing, evidence of the condition and treatment may be excluded as irrelevant. Id.

In this case, the defendant did not seek records, but sought to elicit evidence that Reeves had been hospitalized for alcohol abuse treatment and that her alcohol dependency may have impaired her perception in memory. The trial court clearly allowed the defendant to cross-examine Reeves concerning her ability to recollect relevant facts. Instead of pursuing this line of inquiry, the defendant asked Reeves whether she had been hospitalized and whether she was an alcoholic. The defendant improperly focused on the hospitalization without establishing that Reeves had difficulty recalling events. Hospitalization for alcohol treatment does not itself establish a deficient memory. Similarly, the status of being an alcoholic, without more, does not open witnesses to cross-examination concerning their ability to perceive, recollect or narrate relevant facts. See *State* v. *Joyner*, 225 Conn. 450, 479, 625 A.2d 791 (1993). The trial court afforded the defendant every opportunity to question Reeves

regarding her condition and her memory during each relevant time period. See id. In fact, the defendant twice asked Reeves, without objection, whether her abstinence from alcohol on April 13, 1992, affected her state of mind. Reeves responded no to both questions. Reeves further testified that she had not consumed alcohol during the relevant time periods. We conclude that the trial court did not improperly limit the defendant's cross-examination of Reeves.

The judgment is affirmed.

In this opinion the other judges concurred.